Submitted on remand from the Oregon Supreme Court January 31; resubmitted en banc May 1, affirmed July 18, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# DARIUSH DAVID AMINI,
*Appellant.*

## 94-01-30513; A88710

28 P3d 1204

Sally L. Avera, Public Defender, for appellant.

Hardy Myers, Attorney General, Virginia L. Linder, Solicitor General, and Ann Kelley, Assistant Attorney General, for respondent.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, and Brewer, Judges.

EDMONDS, J.

Haselton, J., concurring.

Armstrong, J., dissenting.

.

## EDMONDS, J.

Defendant appeals his conviction for two counts of aggravated murder, ORS 163.095(1), (2), attempted aggravated murder, ORS 163.095(3), and assault in the second degree with a firearm, ORS 163.175(4). In his only assignment of error, he argues that the giving of a jury instruction about the consequences of a verdict of "guilty except for insanity" violates his constitutional right to a fair trial under the Oregon and United States Constitutions. On appeal, this court initially reversed the convictions on the ground that the instruction violated defendant's right to trial by an impartial jury under Article I, section 11, of the Oregon Constitution. *State v. Amini,* 154 Or App 589, 963 P2d 65 (1998). On review, the Supreme Court reversed, 331 Or 384, 15 P3d 541 (2000), and remanded the case for us to consider defendant's challenge to the trial court's instruction under the Sixth and Fourteenth Amendments to the United States Constitution. On remand, we affirm.

To set the stage for the discussion of defendant's assignment of error under the federal constitution, we quote from the Supreme Court's opinion:

"Defendant was charged with two counts of aggravated murder, one count of attempted aggravated murder, and one count of second-degree assault with a firearm. Those charges stemmed from the deaths of defendant's wife and a foreign exchange student who resided with defendant's wife, and gunshot injuries to another student who was visiting at the residence. At trial, defendant raised the affirmative defense of mental disease or defect constituting insanity. ORS 161.295; ORS 161.305.[1] ORS 161.313 provides that, when the issue of insanity under ORS 161.295 is

---

[1] ORS 161.295 provides:

"(1) A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

"(2) As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

ORS 161.305 provides:

submitted to the jury for determination, 'the court shall instruct the jury in accordance with ORS 161.327.' ORS 161.327, in turn, lists the circumstances under which a defendant may be placed in the jurisdiction of the Psychiatric Security Review Board (PSRB) for care and treatment after a verdict of guilty except for insanity.

"At defendant's trial, the state asked the trial court to give Uniform Criminal Jury Instruction (UCrJI) 1122, which closely parallels the wording of ORS 161.327.[2] Defendant excepted, arguing that the mandate of ORS 161.313,

---

"Mental disease or defect constituting insanity under ORS 161.295 is an affirmative defense."

[2] UCrJI 1122 provides:

"If the defendant is found guilty except for insanity, the defendant is subject to the following dispositions:

"(1) By the court.

"(a) If the court determines that the defendant is presently affected by a mental disease or defect and presents a substantial danger to others requiring commitment to a state mental hospital, the court will order the defendant placed under the jurisdiction of the Psychiatric Security Review Board, and order the defendant committed to a state mental hospital pending further disposition by the Psychiatric Security Review Board.

"(b) If the court finds that the defendant is affected by mental disease or defect but either that it is in remission or that the defendant is not presently a substantial danger to others requiring commitment to a state mental hospital, the court will order the defendant placed under the jurisdiction of the Psychiatric Security Review Board and may order that the defendant be conditionally released. A defendant who is conditionally released is subject to such supervisory orders of the court as are in the best interests of justice, the protection of society, and the welfare of the defendant.

"(2) By the Psychiatric Security Review Board. The Psychiatric Security Review Board is a state agency that by statute has as its primary concern the protection of society. After the court places the defendant under the jurisdiction of the Psychiatric Security Review Board, the board will have jurisdiction over the defendant for a length of time equal to the maximum period of incarceration to which the defendant could have been sentenced had the defendant been found guilty of the charged crime.

"(a) If the board determines that the defendant continues to be affected by a mental disease or defect and presents a substantial danger to others and is not a proper subject for conditional release, the board will order the defendant committed to a state mental hospital for custody, care, and treatment.

"(b) The Psychiatric Security Review Board will order that the defendant be discharged from its jurisdiction if at its first hearing or at some later date the board determines that either

"(i) the defendant is no longer affected by mental disease or defect, or

"(ii) the defendant is still affected by mental disease or defect but no longer presents a substantial danger to others.

combined with the jury instruction required by ORS 161.327, unconstitutionally suggested to the jury that it should and could consider the consequences of a guilty-except-for-insanity verdict in its deliberations. The trial court overruled defendant's objection and gave UCrJI 1122. The court also instructed the jury not to consider what sentence the court might impose if defendant were found guilty. The jury subsequently found defendant guilty." *Amini*, 331 Or at 386-88.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee defendant the right to a fair trial. The Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

The Fourteenth Amendment makes the Sixth Amendment applicable to the states and provides, in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]"

Defendant contends that his fundamental right to a fair trial includes a right to elect whether the statutorily

---

"(c) If the board, either at its first hearing or at some later date, determines that the defendant is still affected by a mental disease or defect and is a substantial danger to others, but can be controlled adequately if conditionally released with treatment as a condition of release, the board will order the defendant to be conditionally released. A defendant who is conditionally released is subject to such supervisory orders of the board as are in the best interest of justice, the protection of society, and the welfare of the person.

"A person is considered to have a mental disease or defect requiring supervision even when that disease or defect is in a state of remission when the disease may, with reasonable medical probability, occasionally become active and render the person a danger to others."

mandated instruction about the consequences of the jury verdict of "guilty except for insanity" should be given. He asserts that,

> "[t]o the extent that an instruction under ORS 161.313 is distracting and extraneous to the chief function of jurors on the issue, the procedure it compels is fundamentally unfair to a defendant who should be entitled to expect a decision on the relevant facts rather than an outcome-focused examination of the facts."

Although defendant does not label it as such, his argument constitutes a facial challenge to ORS 161.313 that requires a jury to be instructed about the consequences of a "guilty except for insanity" verdict. Thus, our inquiry is whether the statute's requirements, when complied with, necessarily prevent a defendant from having a fair trial.

We model our analysis after the course of reasoning in *Duncan v. Louisiana*, 391 US 145, 88 S Ct 1444, 20 L Ed 2d 491 (1968), which requires us to (1) identify the right in question, (2) determine whether that right is fundamental, and then, if it is fundamental, (3) decide whether the challenged procedure that the trial court employed necessarily prevented the realization of the fundamental right. *Duncan,* 391 US at 495-97 (using that methodology to evaluate the constitutionality of a limitation on the right to trial by jury); *see also Victor v. Nebraska,* 511 US 1, 114 S Ct 1239, 127 L Ed 2d 583 (1994) (using the same analysis to evaluate the constitutional implications of a jury instruction on "reasonable doubt").

More to the point, the same kind of analysis has been used by the United States Supreme Court in regard to a jury instruction authorized by an Oregon statute. In *Cupp v. Naughten,* 414 US 141, 94 S Ct 396, 38 L Ed 2d 368 (1973), the defendant was tried for armed robbery. He chose not to testify, and most of the evidence against him was presented in the form of the testimony of witnesses to his alleged criminal activity. The state requested, and the trial court gave, a jury instruction stating that the jury could presume the truthfulness of the witnesses who testified against the defendant, unless the witnesses were otherwise found to be untruthful. The instruction was proper under the Oregon

statute. However, the defendant asserted that the instruction violated federal constitutional guarantees in two particulars: the right to have the jury determine credibility and the right to have the state prove every element of the crime beyond a reasonable doubt. The Court identified the right as the fundamental right to have the prosecution prove guilt beyond a reasonable doubt. It referred to the historical analysis of that right, an analysis that the court had recently undertaken in *In re Winship*, 397 US 358, 90 S Ct 1068, 25 L Ed 2d 368 (1970), in which it had concluded that such a right was fundamental. *Cupp*, 414 US at 147. The Court characterized the issue as whether the instruction "so infected the entire trial that the resulting conviction violates due process." *Id*. While reaffirming its holding in *In re Winship*, the Court concluded that the instruction in *Cupp* did not shift the burden of proving innocence to the defendant. The Court explained:

> "The well-recognized and long-established function of the trial judge to assist the jury [in its deliberations] by such instructions is not emasculated by such abstract and conjectural emanations from *Winship*.

> "It must be remembered that 'review by this Court of state action expressing its notion of what will best further its own security in the administration of criminal justice demands appropriate respect for the deliberative judgment of a state in so basic an exercise of its jurisdiction.'

> "\* \* \* \* \*

> "The jury here was charged fully and explicitly about the presumption of innocence and the State's duty to prove guilt beyond a reasonable doubt. Whatever tangential undercutting of these clearly stated propositions may, as a theoretical matter, have resulted from the giving of the instruction on the presumption of truthfulness is not of constitutional dimension. The giving of that instruction, whether judged in terms of the reasonable-doubt requirement in *In re Winship*, supra, or of offense against 'some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' did not render the conviction constitutionally invalid." *Cupp*, 414 US at 149-50 (citations omitted).

Following the same analytical framework, we turn to the analysis in this case. The right in question is the constitutional guarantee of a fair trial. Without a doubt, such a right is fundamental to our system of justice. The question, then, becomes whether the giving of an instruction that tells the jury about the consequences of one of the three potential verdicts necessarily made defendant's trial and his subsequent conviction constitutionally infirm.

As an initial matter, there is a well-established deference in the United States Supreme Court decisions to legislative determinations by states about criminal prosecutions. As stated in *Patterson v. New York,* 432 US 197, 201-02, 97 S Ct 2319, 53 L Ed 2d 281 (1977):

> "It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government, and that we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States. Among other things, it is normally 'within the power of the State to regulate procedures under which its laws are carried out,' * * * and its decision in this regard is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " (Citations omitted.)

In *Medina v. California,* 505 US 437, 445-46, 112 S Ct 2572, 120 L Ed 2d 353, 363 (1992), the Court explained:

> "As *Patterson* suggests, because the States have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise substantial deference to legislative judgments in this area."

Therefore,

> "[n]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes 'a failure to observe that fundamental fairness essential to the very concept of justice.' " *Donnelly v. De Christoforo,* 416 US 637, 642, 94 S Ct 1868, 40 L Ed 2d 431 (1974).

Consequently,

> "[j]udges are not free in defining 'due process' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' * * * [They] are to determine only whether the action complained of * * * violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions' and which define the 'community's sense of fair play and decency.' " *Dowling v. United States*, 493 US 342, 353, 110 S Ct 668, 107 L Ed 2d 708 (1990), *quoting United States v. Lovasco*, 431 US 783, 790, 97 S Ct 2044, 52 L Ed 2d 752 (1977) (citations omitted).

With regard to jury instructions in criminal cases, the Supreme Court has further explained:

> "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', not merely whether the 'instruction is undesirable, erroneous, or even universally condemned[.]' " *Henderson v. Kibbe,* 431 US 145, 154 97 S Ct 1730, 52 L Ed 2d 203 (1977), *quoting Cupp,* 414 US at 146-147 (footnote omitted).

Also,

> "[a] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. While this does not mean that an instruction by itself may never rise to the level of constitutional error, it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *Cupp,* 414 US at 146-47.

■ With those admonitions in mind, we turn to our analysis of whether the instruction given by the trial court

prevented the realization of defendant's fundamental right to a fair trial. In *Medina*, the United States Supreme Court established an analytical framework that we adopt in evaluating whether the jury instruction requirement of ORS 161.327 is a permissible legislative choice. First, as the *Medina* Court instructed, we must inquire whether the practice that was employed has historically been proscribed, or, in the alternative, whether the practice that defendant would have preferred is a historically mandated process. In *Medina*, the historical analysis swept far back into the 18th century, including precedent from the early English common law. 505 US at 446-48. Similarly, the Court in other cases has looked at least to the early 19th century and has used the law as of the dates of enactment of the Sixth and Fourteenth Amendments to discern whether the decisional law shows that the drafters contemplated a right to a certain procedure or practice. *See, e.g., Patterson*, 432 US at 202 nn 7 and 8. The reason for such an examination is evident. The appropriate question is whether the drafters of those amendments contemplated that they were encompassing a right to prevent the giving of a consequences instruction within the right to a fair trial, or would they have believed that such a matter was one committed to the legislative bodies of the individual states. We have been unable to find *any* historical basis that suggests that the drafters contemplated such a right, and neither defendant nor the dissent offer plausible historical evidence to the contrary.

■ In the absence of a historical basis for concluding that the instruction violates a fundamental right to a fair trial, "we turn to consider whether giving the instruction transgresses any recognized principle of 'fundamental fairness' in operation." *Medina*, 505 US at 448. The recognized principles of fundamental fairness, aside from those enumerated in the Bill of Rights, are narrow in scope. *Dowling*, 493 US at 352. They concern matters that are basic to our conception of justice and that define the community sense of fair play, so that a failure to protect the principles in any given case would necessarily deprive a defendant of a fair trial. *Id.* at 353; *see also United States v. Valenzuela-Bernal*, 458 US 858, 872, 102 S Ct 3440, 73 L Ed 2d 1193 (1982). They are also the sorts of principles about which there can be no

reasonable disagreement. If the right not to have the jury consider the consequences of its "guilty except for insanity" verdict does not fall within the above-described class, then we must conclude that it is a part of the criminal law that has been left to the states' legislative judgment.

■ The issue raised by the instruction in this case does not implicate any of the previously recognized principles of fundamental fairness. The instruction did not alter the state's burden of proof,[3] it did not relieve the state of proving the material elements of its charge,[4] and it did not impinge upon the presumption of innocence accorded to defendant.[5] Moreover, it did not force the jury into an all-or-nothing choice that distorted the fact-finding process,[6] it did not permit an adjudication based on information that defendant had no opportunity to rebut,[7] nor did it require defendant to forgo a defense to the charge that he might otherwise have had.

■ Of course, the above list is not exhaustive of all the principles that the right to a fair trial embodies. Thus, we consider as a final matter whether the statute requiring the giving of the instruction transgresses by implication any other recognized principle of "fundamental fairness" in its operation. *Dowling*, 394 US at 351. As the Court inquired in *Duncan*, is there at stake here some historical principle of justice so rooted in the traditions and conscience of our people that it is "essential for preventing miscarriages of justice and

---

[3] *See Victor v. Nebraska*, 511 US 1, 114 S Ct 1239, 127 L Ed 2d 583 (1994); *see also Carella v. California*, 491 US 263, 109 S Ct 2419, 105 L Ed 2d 218 (1989).

[4] *See Osborne v. Ohio*, 495 US 103, 110 S Ct 1691, 109 L Ed 2d 98 (1990).

[5] *See Sandstrom v. Montana*, 442 US 510, 99 S Ct 2450, 61 L Ed 2d 39 (1979); *see also Cupp*, 414 US at 141.

[6] *See Beck v. Alabama*, 447 US 625, 100 S Ct 2382, 65 L Ed 2d 392 (1980) (holding that the failure to consider lesser-included offenses violates due process). *See also Schad v. Arizona*, 501 US 624, 111 S Ct 2491, 115 L Ed 2d 555 (1991) (distinguishing *Beck* when the fact-finding process is not distorted and there is no risk that the jury will convict to avoid setting the defendant free).

[7] In *Simmons v. South Carolina*, 512 US 154, 114 S Ct 2187, 129 L Ed 2d 133 (1994), the Court held that where a premise for the imposition of the death penalty is future dangerousness, the jury was entitled to know that petitioner could be denied release on parole because otherwise, the omission of such information created a false choice between sentencing defendant to death and sentencing him to life imprisonment.

for insuring that fair trials are provided for all defendants[?]"
391 US at 158.

■ In that inquiry, we must be careful to distinguish
between principles that are fundamental to the notion of a
fair trial and other principles that may be rooted in the com-
mon law. In *Snyder v. Massachusetts*, 291 US 97, 107, 54 S Ct
330, 78 L Ed 674 (1934), *overruled in part by Malloy v.
Hogan*, 378 US 1, 84 S Ct 1489, 12 L Ed 2d 653 (1964), the
Supreme Court said:

> "Confusion of thought will result if we fail to make the dis-
> tinction between requirements * * * that have their source
> in the common law, and requirements that have their
> source, either expressly or by implication, in the federal
> constitution."

It does not necessarily follow that because a legal principle
existed at common law, it is the kind of principle that the
community would have considered fundamental to a fair trial
at the time of the adoption of the constitution. As the
Supreme Court said in *Gannett Co. v. DePasquale*, 443 US
368, 384, 99 S Ct 2898, 61 L Ed 2d 608 (1979), regarding the
public's right to attend a pretrial hearing:

> "In arguing that members of the general public have a
> constitutional right to attend a criminal trial, despite the
> obvious lack of support for such a right in the structure or
> text of the Sixth Amendment, the petitioner and amici rely
> on the history of the public-trial guarantee. This history,
> however, ultimately demonstrates no more than the exis-
> tence of a common-law rule of open civil and criminal
> proceedings.
>
> "*Not many common-law rules have been elevated to the
> status of constitutional rights.* The provisions of our Consti-
> tution do reflect an incorporation of certain few common-
> law rules and a rejection of others. The common-law right to
> a jury trial, for example, is explicitly embodied in the Sixth
> and Seventh Amendments. The common-law rule that
> looked upon jurors as interested parties who could give evi-
> dence against a defendant was explicitly rejected by the
> Sixth Amendment provision that defendant is entitled to be
> tried by an 'impartial jury.' But *the vast majority of com-
> mon-law rules were neither made part of the Constitution*

nor explicitly rejected by it."[8] (Footnote omitted; emphasis added.)

With this background, we evaluate defendant's assertion that the right to object to an insanity consequences instruction is included implicitly within the fundamental right to a fair trial. There is no case in any jurisdiction that has so held. The best evidence that such a right reflects a principle of fundamental justice rooted in the traditions and conscience of our people is that *some* jurisdictions embrace it as part of their common law. *See Boykins v. Wainwright*, 737 F2d 1539 (11th Cir 1984), *cert den* 470 US 1059 (1985); *Bassik v. Scully*, 588 F Supp 895 (EDNY 1984); *Campbell v. Bates*, 416 F Supp 1111 (D Mass 1976). But most important to our analysis, there is a competing view that such an instruction acts as a *safeguard* to a fair trial that is reasonable in our opinion. *See Lyles v. United States*, 254 F2d 725 (DC Cir 1957), *overruled in part by U.S. v. Brawner*, 471 F 2d 969 (DC Cir 1972); *Commonwealth v. Mutina*, 366 Mass 810, 323 NE2d 294 (Mass 1975); *State v. Shickles*, 760 P2d 291 (Utah 1988), *abrogated by State v. Doporto*, 935 P2d 484 (Utah 1997), and the cases cited by the dissent. 175 Or App at 390 n 4 (Armstrong, J., dissenting). While it can reasonably be argued that such an instruction is detrimental to a defendant because it causes the jury to focus on the consequence of a "not guilty by reason of insanity" verdict rather than on the facts surrounding guilt or innocence, it can also be reasonably argued that such an instruction promotes a fair trial because it overcomes the fear that such a verdict would result

---

[8] The distinction between a fundamental principle essential to the constitutional right to a fair trial and a common-law rule is the necessary predicate to understanding the difference between the positions of the majority and the dissent in this case. In general, the concepts have different origins. Constitutional principles flow from the grant of authority from the people to the federal government. They stand as unalterable principles around which other rules of law are created. In contrast, common-law rules represent practices or rules adopted by courts over a period of time that reflect evolving views of fairness. Common-law rules are flexible and are often driven by competing views that balance tactical advantages and disadvantages. Where that balance lies may vary from one jurisdiction to another. Thus a state's criminal procedure "does not run afoul of the Fourteenth Amendment because another method may seem to [the court's] thinking to be fairer or wiser or give a surer promise of protection to the prisoner at the bar." *Snyder*, 291 US at 105. "The Due Process Clause does not, however, require a State to adopt one procedure over another on the basis that it may produce results more favorable to the accused." *Medina*, 505 US at 451.

in the release of a dangerous person back into society. Indeed, it is difficult to reason that the right to object to an insanity verdict consequences instruction would have been implicitly contemplated as part of the community sense of a fair trial when reasonable people could disagree as to whether such an instruction promotes a fair trial. Accordingly, we are led by that observation to reject defendant's argument that the right to object to such an instruction is embodied in the Sixth and Fourteenth Amendments.

The dissent reasons otherwise. It begins with the general principle that a jury should reach its verdict based on the facts of the case and the applicable law without being influenced by the consequences of its verdict. It then relies on statements from *State v. Wall*, 78 Or App 81, 84, 715 P2d 96, *rev den* 301 Or 241 (1986), and *Shannon v. United States*, 512 US 573, 114 S Ct 2419, 129 L Ed 2d 459 (1994), to transform that general common-law principle into a specific rule of constitutional proportions regarding instructions that explain the consequences of a verdict of "guilty except for insanity." In doing so, it ignores the deference to legislative determinations about criminal prosecutions accorded to the states by the United States Supreme Court in its interpretations of the Due Process Clause. Second, it fails to acknowledge that even unanimously held principles of common law do not necessarily equate to principles of constitutional fairness. In *Cupp*, 414 US at 146, the Supreme Court explained:

> "[E]ven substantial unanimity among federal courts of appeals that the instruction in question ought not to be given in United States district courts within their respective jurisdictions is not, without more, authority for declaring that the giving of the instruction makes a resulting conviction invalid under the Fourteenth Amendment."

Also, the dissent discounts the guidelines in the Supreme Court's decisions deciding similar arguments that undercut its position. One additional general observation about the dissent's analysis: that the dissent may disagree with the decisions of some jurisdictions permitting a jury to be instructed about the consequences of an insanity verdict over a defendant's objection does not detract from the reality that there is split authority in the common law on the issue.

■ Having no historical support for its position, the dissent is left to create a constitutional right by using *Shannon* as a springboard.[9] In that case, the defendant raised an insanity defense and asked the court to instruct the jury that he would be involuntarily committed if the jury returned a verdict of "not guilty only by reason of insanity." The trial court refused to give the instruction, and the defendant was convicted. Before the Supreme Court, the defendant argued that such an instruction was required when requested under the federal Insanity Defense Reform Act of 1984 and as a matter of general *federal* criminal practice. The Court rejected both arguments. In that context, the Court said that

> "[i]t is well-established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.' The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion." *Shannon*, 512 US at 579 (citations omitted).

From the above language, the dissent concludes that the *Shannon* court characterizes the principle that a jury should reach its verdict based on the facts of the case and the applicable law and not on the consequences of its verdict "as fundamental" to a fair trial. 175 Or App at 395 (Armstrong, J., dissenting). The problem with that conclusion is that the *Shannon* Court was not concerned with the Sixth Amendment right to a fair trial because the defendant did not make that argument. The "well established" principle that the

---

[9] The dissent also finds support for its rationale in a statement in *Honda Motor Co. v. Oberg*, 512 US 415, 430, 114 S Ct 2331, 129 L Ed 2d 336 (1994), that an abrogation of a well-established common law against the arbitrary deprivations of property raises a presumption of a due process violation. The dissent does not explain how a presumptive violation occurs when the common law is split on the issue.

Court refers to in *Shannon* is a general common-law principle.[10] Moreover, the defendant in *Shannon* assigned error to the *failure to give* the kind of instruction that defendant urges deprived him of a fair trial in this case, once again demonstrating how reasonable minds can differ on the benefits of such an instruction. Finally, the general principle that a jury should reach its verdict without regard to what sentence might be imposed was honored in this case by the giving of another instruction telling the jury to disregard the consequences in reaching its verdict.[11]

As we pointed out earlier, recognized principles of fundamental fairness are principles that define the community's sense of fair play and about which there can be no reasonable disagreement; that is a subject that the *Shannon* Court never purports to discuss. In our view, the dissent's construct cannot withstand scrutiny under the *Medina* tests for that reason. Rather, the issue in this case resembles the issue considered by the Supreme Court in *Martin v. Ohio*, 480 US 228, 107 S Ct 1098, 94 L Ed 2d 267 (1987). In *Martin*, the Court specifically rejected the argument that an Ohio statute violated due process because it placed the burden of proving self-defense on the defendant who was charged with aggravated murder. At common law, the rule was that self-defense was an affirmative defense for the defendant to prove. That was the rule when the Fifth Amendment was adopted and when the Fourteenth Amendment was ratified. By the time that *Martin* had reached the Supreme Court, all but two states had abandoned the common-law rule and required the prosecution to prove the absence of self-defense. Nonetheless, the Court upheld the constitutionality of the Ohio statute that was contrary to the current trend in the

---

[10] The *Shannon* Court affirmed the defendant's conviction; it did not hold it constitutionally infirm.

[11] The trial court appeared later to have qualified that instruction. It could be argued that there was a conflict between the court's giving of the consequences instruction, and its instruction to disregard the consequences of its verdict. Defendant does not assign error to any purported conflict between the instructions. In any case, the giving of conflicting, confusing or erroneous jury instructions is reviewed by an appellate court in its "supervisory role," not in its role as an interpreter of the constitutional guarantees, and contradictory instructions can be struck down on grounds of sound judicial practice without finding that they violate constitutional rights. *Cupp*, 414 US at 146.

law. Rejecting the argument that the Ohio statute violated due process, the Court observed,

> "[w]e are aware that all but two of the States, Ohio and South Carolina, have abandoned the common-law rule and require the prosecution to prove the absence of self-defense when it is properly raised by the defendant. But the question remains whether those States are in violation of the Constitution; and, as we observed in *Patterson, that question is not answered by cataloging the practices of other States." Martin*, 480 US at 236.[12] (Emphasis added.)

Similarly to *Martin*, the issue in this case involves a statute that is in conflict with the common-law rule of some states, but the question of whether the instruction infringed upon the fairness of defendant's trial is not answered by cataloging the practices of those states that agree with the dissent's preference. In summary, we hold that defendant's due process rights were not violated when the trial court gave UCrJI 1122 pursuant to ORS 161.313. We arrive at that conclusion because there is no evidence that the drafters of the Sixth and Fourteenth Amendments would have contemplated that the rule proposed by defendant was necessary to a fair trial. Nor are we persuaded that the right advocated by defendant is the kind of right that is so basic to the community sense of fairness that it would have been contemplated that the failure to protect that right in any given case necessarily would have deprived a defendant of a fair trial. We think that the law is clear that to hold that the state legislature could not enact constitutionally a statute like ORS 161.313 would "invite[ ] undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order." *Medina*, 505 US at 443.

Affirmed.

---

[12] In *Leland v. State of Oregon*, 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952), the Court upheld an Oregon statute against a due process challenge even though Oregon was the only state in the nation to require a defendant to prove the defense of insanity beyond a reasonable doubt.

**HASELTON, J.,** concurring.

The dissent complains that the majority "repudiates without explanation" our prior decision on the "essential issue" in this case. *See* 175 Or App at 387 (Armstrong, J., dissenting). I was one of the judges who joined in our original majority opinion, *State v. Amini*, 154 Or App 589, 963 P2d 65 (1998), and I have, in fact, "switched sides." There is an explanation: When faced with new and ultimately compelling arguments, judges can, and should, change their minds.

In *Amini I*, we referred, collaterally, to federal precedent. *See* 154 Or App at 596-99. However, because we did not reach the federal constitutional issues, we had no occasion to focus on, and grapple with, the principles that drive the majority's analysis. I believe that analysis is unanswerable. Accordingly, I concur.

**ARMSTRONG, J.,** dissenting.

This case does not come to us on a clean slate. We already decided the essential issue, a decision that the majority now repudiates without an explanation that confronts our previous analysis. In our previous decision, we held that it is fundamentally unfair to instruct the jury about the consequences of a verdict of guilty except for insanity when the defendant objects to the instruction. We also concluded that Article I, section 11, of the Oregon Constitution, protects the fundamental fairness of a criminal trial and therefore relied on that provision in reversing defendant's conviction. *State v. Amini*, 154 Or App 589, 963 P2d 65 (1998); *see also State v. Kennedy*, 295 Or 260, 262-68, 666 P2d 1316 (1983) (proper procedure is to decide issues under state constitution before reaching those under federal constitution). On review, the Supreme Court held that Article I, section 11, has a more limited reach than we had given it and therefore reversed our decision. It did not question our conclusion that the instruction was fundamentally unfair but instead remanded the case to us so that we could consider defendant's arguments under the Sixth and Fourteenth Amendments, the federal guaranties of fundamental fairness and due process in criminal trials. *State v. Amini*, 331 Or 384, 15 P3d 541 (2000).

The majority now rejects our Supreme Court's invitation to apply the federal constitution to reach the same conclusion that we previously reached about the legality of giving the instruction over defendant's objection, *see* 331 Or at 395-97 (Durham, J., concurring), and instead retracts its previous decision. According to the majority's recently acquired view, it was neither fundamentally unfair nor otherwise a violation of due process to give the jury, over defendant's protests, an extensive—indeed, almost endless—instruction on an irrelevant subject even though defendant legitimately feared that doing so would scare the jury into rejecting his insanity defense in order to prevent his early release. In order to achieve its result, the majority grabs onto isolated statements in United States Supreme Court opinions to adopt a unique approach to determining what protections the Due Process Clause provides, one that is different from the approach that the Court uses. Because I believe that we were right before when we held that the instruction was fundamentally unfair, because I would follow the Court's express due process analysis rather than the majority's creation, and because I believe that the correct analysis shows that the federal constitution prohibits giving the instruction over defendant's objection, I dissent.

Despite its numerous citations, the majority opinion almost completely ignores the central issue in the case: the constitutional propriety of *this* instruction, not of instructions or criminal procedural rules in general. I will begin by summarizing the reasons that we gave to support our original conclusion that giving this instruction over defendant's objection was fundamentally unfair; I find those reasons to continue to be compelling.[1] We reached our conclusion after discussing a number of decisions concerning consequences

---

[1] Defendant does not challenge the breadth of the instruction. Thus, he does not argue that all that ORS 161.313 requires is that the court tell the jury that a person who is found guilty except for insanity will be committed to the jurisdiction of the Psychiatric Security Review Board (PSRB) for the maximum term for which he or she could have been incarcerated on conviction of the charged crimes, with the possibility of release from custody before then if the court or the PSRB determines that the person no longer suffers from a mental disease or defect or that the release will not present a substantial danger to the public. Because of the limited nature of defendant's arguments, I will focus more on the propriety of consequences instructions in general rather than on this specific instruction.

instructions in insanity cases, which together led us to believe that the instruction could "influence a jury to disregard the merits of the defense and to find the 'defendant guilty in order to avoid his early release back into society, thereby depriving him of a fair trial.' " *Amini*, 154 Or App at 601 (quoting *State v. Wall*, 78 Or App 81, 84, 715 P2d 96, *rev den* 301 Or 241 (1986)).

The most common justification for a consequences instruction is that, without it, the jury may be unwilling to find a defendant insane because of a concern that such a verdict would set a dangerous person free. *Lyles v. United States*, 254 F2d 725, 728 (DC Cir 1957), provides the classic statement of that position. That justification, of course, assumes that the defendant either requests or, at least, agrees to the instruction.[2] In contrast, part of the reason for our previous decision was our concern that a consequences instruction would be inherently prejudicial to a criminal defendant, because it could indicate to the jury that the defendant might be released sooner than if he or she were convicted. In support of that concern, we cited the discussions in *Wall* and *Shannon v. United States*, 512 US 573, 114 S Ct 2419, 129 L Ed 2d 459 (1994).[3] In *Shannon*, the Court pointed out that an accurate consequences instruction would not assure the jury that the defendant would be hospitalized for a lengthy period but, rather, could suggest the possibility that the defendant would be released within a relatively short time. We also noted that Justice Stevens, in his dissent in *Shannon*, responded to that argument by stating that there was no need to give the instruction unless the defendant requested it. *Amini*, 154 Or App at 591 (summarizing *Shannon*, 512 US at 585-86 (opinion of the court), 591 (Stevens, J., dissenting)).

Many state courts have held, consistently with Justice Stevens' statement, that a consequences instruction is proper only when the defendant either requests it or does not

---

[2] One of the curious things about this case is that the only justification that anyone suggests for giving a consequences instruction over defendant's objection is that the statute requires it. Neither the state nor the majority suggests any legitimate purpose for the instruction or any way in which it could legitimately benefit the state's case.

[3] In *Shannon*, the Court expressly rejected the holding of *Lyles*, which required the trial court to give a consequences instruction at the defendant's request.

object. At the time of our original opinion, we could not find a case that held that a court should give such an instruction over the defendant's objection, as the trial court did in this case. *Id.* at 599-600. Even though I have now found a few such opinions,[4] our basic point remains valid: Because the only purpose that courts have provided for giving a consequences instruction is to benefit the defendant, there is no legitimate reason for giving such an instruction when the defendant believes that it would be more harmful than helpful.

Finally, in *Amini* we noted that the problems with a consequences instruction are particularly severe where the instruction is long and exhaustively detailed, which could both suggest to the jury that the question of the consequences of an insanity verdict *is* for its consideration and give it a multitude of speculative comparisons between the consequences of an insanity finding and what it might assume to be the generally simpler effects of a finding of guilt.[5] We concluded that a consequences instruction is a two-edged sword and that the Oregon statutes require "that criminal defendants submit to the risk of which edge a particular jury might finding more alluring," although neither edge of the sword is a proper matter for the jury's consideration. *Amini,* 154 Or App at 600-01. The potential of the instruction "for diverting the jury from the question that was properly before it, and leading it to reject the defense on the basis of impermissible considerations unrelated to its merits, deprived defendant of a fair trial." *Id.* at 602.

The essential issue on remand is whether we continue to believe that informing the jury, over defendant's objection, about the consequences of its verdict deprived defendant of a fair trial. In attempting to explain its change

---

[4] *See, e.g., State v. Hamilton,* 216 Kan 559, 534 P2d 226, 228-31 (1975) (the defendant did not object to instruction at trial and it was not clearly erroneous as a matter of law; no significant discussion of effect of the defendant's objection); *Kuk v. State,* 80 Nev 291, 392 P2d 630, 634-35 (1964) (states, without explanation, that giving the instruction should not depend on whether the defendant wants it). Because of the lack of analysis in those cases, they have little persuasive value.

[5] For a more extensive discussion of this point in the context of a similar instruction, see *People v. Goad,* 421 Mich 20, 364 NW2d 584, 589-92 (1994).

of mind, the majority discusses many things. What it generally ignores is the crucial issue in the case: the fundamental principle that a jury should render its verdict based on the facts and law of the case before it, not on its understanding of the legal consequences that may flow from the verdict. As the United States Supreme Court stated when it explained why a consequences instruction is improper in a federal trial, that principle is universally recognized in American jurisprudence:

> "The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."

*Shannon*, 512 US at 579; *see also Amini*, 154 Or App at 595-96; *Lyles*, 254 F2d at 728; *People v. Moore*, 166 Cal App 3d 540, 211 Cal Rptr 856, 861 (1985); *State v. Wood*, 208 Conn 125, 545 A2d 1026, 1034-36, *cert den* 488 US 895 (1988); *State v. Huiett*, 271 SC 205, 246 SE2d 862, 864 (1978).[6] The universal recognition of this principle reflects a settled historical understanding of the appropriate process in a criminal case, and it therefore has constitutional significance under the Due Process Clause.[7]

---

[6] My citations to other jurisdictions are exemplary rather than exhaustive. There is a thorough listing and categorization of the relevant cases in Thomas M. Fleming, *Instructions in State Criminal Case in which Defendant Pleads Insanity as to Hospital Confinement in Event of Acquittal*, 81 ALR4th 659 (1990 and Supp 2000).

[7] The constitutional principle is that the court should not instruct the jury *at all* about the consequences of its verdict, not merely that it should not instruct the jury about the consequences of an insanity verdict. The instruction in this case violates that principle, but so could many other instructions that have nothing to do with insanity.

The Supreme Court has relied on several approaches to determining the nature of the due process that the Fourteenth Amendment protects.[8] Which approach is appropriate depends in part on the particular situation. In some cases due process may simply require applying to the states the provisions of the Bill of Rights. *See, e.g., Mapp v. Ohio,* 367 US 643, 81 S Ct 1684, 6 L Ed 2d 1081 (1961). In others, the Court follows the balancing test that it established in *Mathews v. Eldridge,* 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976).[9] The approach that is relevant to this case is based on a historical analysis of the process that was generally accepted as "due" at the adoption of the Fourteenth Amendment.

Recognizing that, for those who adopted the Fourteenth Amendment, "due process" was necessarily connected with the procedures that the common law had developed over the centuries, the Court has indicated that a traditional common-law rule that is universally or almost universally understood to be basic to a fair trial is likely to be part of the fundamental fairness that the Due Process Cause protects.[10]

---

[8] Because I base my conclusions on the Fourteenth Amendment's general requirement of due process, I do not need to consider the extent to which the specific provisions of Sixth Amendment may be relevant to this case.

[9] In *Medina v. California,* 505 US 437, 442-45, 112 S Ct 2572, 120 L Ed 2d 353 (1992), a majority of the Court questioned the applicability of *Mathews* to a criminal case. *But see Medina,* 505 US at 453 (O'Connor, J., concurring) and 456, 459 (Blackman, J., dissenting) (both arguing for the applicability of *Mathews*). Because I do not rely on a *Mathews*-style balancing approach in this case, I mention that case only to point out the variety of approaches that the Court has taken to determining what due process requires.

[10] The applicable common-law rule, of course, is the rule that existed at the adoption of the Fourteenth Amendment and that those who enacted that amendment therefore believed to be part of the due process of law that they were protecting. For that reason, cases such as *Martin v. Ohio,* 480 US 228, 107 S Ct 1098, 94 L Ed 2d 267 (1987), that refuse to treat the converse of a traditional common-law rule as a part of due process are irrelevant to this point. *See* below, 175 Or App at 394 n 11. The majority takes statements in other cases out of their appropriate context. Thus, in *Snyder v. Massachusetts,* 291 US 97, 54 S Ct 330, 78 L Ed 674 (1934), the issue was whether the defendant had a right to attend a jury view in person rather than simply through counsel. There was no clear common-law rule on the issue; in that context, the Court's warning against confusing the issues of common-law rights and due process was simply a preliminary to deciding the case. In *Gannett Co. v. DePasquale,* 443 US 368, 99 S Ct 2898, 61 L Ed 2d 608 (1979), the issue was whether the media had a right under the Sixth Amendment to attend a hearing that the court had closed *at the defendant's request.* The common-law rules that the Court discussed had nothing to do with a defendant's right to due process under the Fourteenth Amendment.

Thus, in *In re Winship*, 397 US 358, 90 S Ct 1068, 25 L Ed 2d 368 (1970), the Court relied on the long-established and virtually unanimous requirement of proof beyond a reasonable doubt in criminal cases as the basis for its holding that that burden of proof is a requirement of due process. It pointed out that such unanimous adherence to a procedural standard reflects a profound judgment about the administration of the law. Although universal adherence does not conclusively establish that the standard is part of due process, it plays an important role in determining what due process requires. *In re Winship*, 397 US at 361-62.

The Court applied a similar analysis in *Medina v. California*, 505 US 437, 112 S Ct 2572, 120 L Ed 2d 353 (1992), in which it concluded that it did not violate due process to require the defendant to bear the burden of proving that he was incompetent to stand trial. The Court first noted that "[h]istorical practice is probative of whether a procedural rule can be characterized as fundamental." *Medina*, 505 US at 446. Thus, the "rule that a criminal defendant who is incompetent should not be required to stand trial has deep roots in our common-law heritage." *Id.* (citing *Drope v. Missouri*, 420 US 162, 171, 95 S Ct 896, 43 L Ed 2d 103 (1975) ("the prohibition is fundamental to an adversary system of justice," *Drope*, 420 US at 172)). The Court then examined historical practice concerning the allocation of the burden of proof of a defendant's competence and concluded that there was no settled historical practice, either in England or in this country. It then examined contemporary practice, although such practice is of limited relevance to a due process inquiry, and found that it also reflected a variety of approaches to the issue. *Id.* at 446-48.

Only after determining that neither historical nor contemporary practice answered the question did the Court turn to whether placing the burden on the defendant "transgresses any recognized principle of 'fundamental fairness' in operation," the issue in cases such as *Dowling v. United States*, 493 US 342, 110 S Ct 668, 107 L Ed 2d 708 (1990), and *Leland v. Oregon*, 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952). *Medina*, 505 US at 448. After examining a number of

arguments supporting the defendant's claim, the Court ultimately concluded that requiring him to prove that he was incompetent to stand trial did not violate due process.

The essential point of *Medina* for purposes of this case is that the Court treated the historical inquiry as coming before and being separate from the search for some other principle of fundamental fairness. The case shows the seriousness with which the Court looks at historical practices and the care that it takes in examining the relationship between those practices and the requirements of due process. It conducts that examination in order to determine whether a challenged rule " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Medina*, 505 US at 446 (quoting *Patterson v. New York*, 432 US 197, 202, 97 S Ct 2319, 53 L Ed 2d 281 (1977)). The purpose of the historical inquiry is to determine how rooted a particular practice is. Although there was no firmly rooted practice in *Medina*, the Court's discussion shows that such a practice, if it had existed, would have led to a different result.

The importance of the historical approach is clear from a later decision concerning the relationship between a traditional practice and the requirements of due process. In *Honda Motor Co. v. Oberg*, 512 US 415, 430, 114 S Ct 2331, 129 L Ed 2d 336 (1994), the Court held that a state's "abrogation of a well-established common-law protection against the arbitrary deprivation of property raises a presumption that its procedures violate the Due Process Clause." The fact that a defendant could seek a remittitur of excessive punitive damages in every state except Oregon was an essential component of the Court's holding that Oregon's procedures fell short of the requirements of due process. The Court emphasized that "traditional practice provides a touchstone for constitutional analysis" and noted that most traditional protections are regarded as so fundamental that there are few cases that involve their denial. Rather, most due process cases involve arguments that the traditional procedures provide too little protection and additional safeguards are necessary. *Id.*[11]

---

[11] That is true, for instance, of *Martin*, in which the issue was whether Ohio violated due process by adhering to the common-law rule that a defendant must

The Court did not hold in *Oberg* that all deviations from traditional practice are constitutionally infirm; the law must be able to progress. However, it pointed out that cases that permit departures from, rather than additions to, traditional procedural protections generally involve either substituted procedures that provide comparable protection, such as a preliminary hearing before a neutral magistrate instead of indictment by a grand jury, *Hurtado v. California*, 110 US 516, 4 S Ct 111, 28 L Ed 232 (1884),[12] or respond to changed economic and social conditions that the original procedures did not contemplate, such as broader amenability to subject-matter jurisdiction, *International Shoe Co. v. Washington*, 326 US 310, 66 S Ct 154, 90 L Ed 95 (1945). *Oberg*, 512 US at 430-31. Thus, in the absence of either an acceptable substitute or significantly changed conditions, unanimously accepted procedural safeguards are likely to establish the floor for due process.

The application of the Court's historical due process analysis to this case is clear. The basic principle that a jury should reach its verdict based on the facts of the case and the applicable law, not on the consequences of its verdict, is a well-established principle of the common law. In *Shannon* the Court expressly described it as fundamental; it "is a reflection of the basic division of labor in our legal system between judge and jury." *Shannon*, 512 US at 579.[13] The

---

prove self-defense by a preponderance of the evidence. The Court noted that Ohio was one of only two states that had not shifted the burden to the prosecution, but that contemporary change did not affect the due process analysis. *Martin*, 480 US at 235-36. In both *Martin* and *Patterson*, which took a similar position concerning shifting the burden of proof of other affirmative defenses, the question was whether due process required a *change* from the common-law rule. In contrast, in this case the question is whether due process requires *adhering* to the common-law rule. It is much more likely that those who adopted the Fourteenth Amendment contemplated that existing common-law principles were part of due process than that they contemplated giving changes from the common law that status, even when those changes favor the defendant.

¹² The Court's references to *Hurtado* and to other criminal cases, along with the general compatibility between its analysis in *Oberg* and that in *Winship* and *Medina*, makes it clear that the *Oberg* approach to the relationship between traditional procedures and due process applies to criminal proceedings as much as to civil.

¹³ Although, as the majority notes, *Shannon* is not itself a constitutional case, the Court's discussion of the reasons for rejecting consequences instructions has constitutional significance.

instruction that defendant challenges, like other conse-
quences instructions, violates that basic principle. It gives
the jury irrelevant information that legally should play no
role in its decision. As the Court noted in *Shannon*, and as we
agreed in our previous opinion, it is as likely that the jury will
use that information against the defendant as that it will use
it in his or her favor. The change, thus, is neither an accepted
substitute for existing protections nor an appropriate adap-
tation to changed conditions. I would hold that something
this fundamental, and this potentially damaging to a defen-
dant's right to a jury decision based on the facts of the case
rather than extrinsic considerations, is part of the due proc-
ess that the Fourteenth Amendment secures. It was thus a
violation of that amendment to give the instruction over
defendant's objection.[14]

My conclusion does not leave ORS 161.313 without
meaning. The rule against instructing a jury about the con-
sequences of its decision may benefit the prosecution as well
as the defendant.[15] In the absence of the statute, Oregon
might well have joined those states that absolutely prohibit
giving such an instruction, including at the defendant's
request. In enacting the statute, the legislature determined
that Oregon's public policy does not require that the *state*
adhere to the common-law rule. As a result, that rule no
longer provides the basis for the prosecution to object to a
defendant's request for an instruction that complies with the
statute. That means that a defendant is free to waive the con-
stitutional protection against the instruction; if the defen-
dant does so, the statute requires the trial court to give an
appropriate consequences instruction. The combination of
the constitutional protection and the statute, thus, is to place
defendants in Oregon in the same position as defendants in

---

[14] To repeat: With a few exceptions, none of which gives any persuasive reason
for its conclusion, the cases that permit giving the instruction either implicitly or
explicitly provide that the defendant must either request or, at the least, acquiesce
in it. In that situation, the defendant can decide whether to run the risk that the
jury will use the instruction unfavorably to him or her. Unlike the majority, the
cases do not provide for forcing the instruction on an unwilling defendant.

[15] One could speculate, for instance, about the verdict that the jury in *State v.
Thorp*, 166 Or App 564, 2 P3d 903 (2000), *rev allowed* 331 Or 598 (2001), might
have given if it had known the mandatory sentence that the defendant faced upon
conviction.

those states that require the court to give the instruction at the defendant's request.

The majority takes a different approach to determining what due process requires. Rather than confronting the analysis by which the Court has determined whether the Fourteenth Amendment requires a particular procedural safeguard, it quotes general hortatory statements about the power of states to regulate procedural matters.[16] Thus, in *Patterson*, the Court stated that a state's decision to use a certain procedure does not violate due process "unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Patterson*, 432 US at 202 (citations omitted). That statement, of course, indicates that rejection of a procedure that *is* fundamental *will* violate due process. The majority also quotes cases in which the Court has stated that it defers to states in matters of criminal procedure because of their expertise in the area, grounded in centuries of common-law tradition, *Medina*, 505 US at 445-46, that not every error that might lead to application of the Court's supervisory powers is a failure of fundamental fairness, *Donnelly v. DeChristoforo*, 416 US 637, 642, 94 S Ct 1868, 40 L Ed 2d 431 (1974), and that judges may not use due process as an excuse for imposing their personal views of fairness. *Dowling v. United States*, 493 US 342, 353, 110 S Ct 668, 107 L Ed 2d 708 (1990). None of those repetitions of the obvious describes either the Court's analysis in the particular case or the general criteria for determining what is fundamentally fair or what due process otherwise requires.

The majority says that it relies on *Medina* as providing the analytical framework for determining whether this instruction prevented a fair trial. Despite that statement, it somehow misses the basic point of the historical discussion in *Medina*, which is that a well-established common-law rule is likely to establish a basic due process requirement. The

---

[16] The majority's reference to *Duncan v. Louisiana*, 391 US 145, 88 S Ct 1444, 28 L Ed 2d 491 (1968), does not add anything to the analysis. Because the majority does not correctly identify the right in question—to have the jury base its decision on the relevant facts and law, not on the consequences of its decision—the majority also does not determine whether that right is fundamental or whether the instruction interfered with it.

majority ignores that the defendant was unsuccessful in *Medina* primarily because he was unable to show that the position that he took was well established. There was simply no historical basis for concluding that requiring the defendant to prove incompetence violated due process.

The majority suggests that under *Medina* the issue is whether those who wrote and approved the Fourteenth Amendment would have contemplated that a right not to have a court give a consequences instruction was within the limitations that the Due Process Clause placed on the states. What it fails to recognize is that, as the Court's historical analysis indicates, common-law rules that were well established in 1868 are exactly what those who wrote and approved the Fourteenth Amendment had most clearly in their minds when they thought of the due process of law. The majority appears to accept that in *Medina* the Court held that a well-established common-law rule—a rule that those involved in adopting the Fourteenth Amendment would have known—is likely to be a requirement of due process. The majority does not, however, take the obvious next step and attempt to determine whether the rule against informing the jury of the consequences of its decision is a well-established common-law rule. If it had, it would not have had to look far for the answer, because in *Shannon* the Court made it clear that the rule is well established.

The majority refers to a number of cases in which state and federal courts have reached different conclusions about whether a court should give a consequences instruction, *at the defendant's request,* when the defendant raises an insanity defense. Those cases do not show a difference of opinion on the basic common-law principle that a court should not tell the jury about the consequences of its decision. Rather, they reflect a disagreement about whether the court should ignore that principle when a defendant asks it to do so. Thus, the majority's comment that no court has held that giving a consequences instruction implicates the fundamental fairness of a trial is simply irrelevant; that was not the issue in the cases that the majority cites. Aside from a few cases that are devoid of analysis, no court has held that it is acceptable to give a consequences instruction over a defendant's objection.

The majority also makes a number of statements about the way to analyze due process issues that are either so general as to give no guidance or do not confront the Court's cases. I do not think that it would be useful to discuss them in any additional detail.[17] None of them affects the basic principle that I have discussed: The prohibition on consequences instructions is so deeply rooted in our common-law traditions that it is part of constitutional due process. As a result, giving the instruction over defendant's objection violated his federal constitutional rights and deprived him of a fair trial. We should adhere to our original opinion and again reverse defendant's conviction. Because we do not, I dissent.

---

[17] *Simmons v. South Carolina*, 512 US 154, 114 S Ct 2187, 129 L Ed 2d 133 (1994), in which the Court held that the jury was entitled to know that a defendant whom it sentenced to life imprisonment rather than death could be denied release on parole, has nothing to do with this case. When the jury is determining a convicted defendant's sentence, knowledge of the consequences of its decision is essential to its task. In that respect, sentencing is qualitatively different from the determination of guilt or innocence.