# IN THE SUPREME COURT OF IOWA

No. 10–0631

Filed July 20, 2012

**STATE OF IOWA,**

    Appellee,

vs.

**MARK DARYL BECKER,**

    Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Butler County, Stephen P. Carroll, Judge.

Mark Becker appeals his conviction for first-degree murder claiming the district court erred in refusing to give his proposed instruction defining the elements of the insanity defense and that the district court erred when it refused to instruct the jury of the consequences of a verdict of not guilty by reason of insanity. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Darrel L. Mullins, Scott D. Brown, and Andrew B. Prosser, Assistant Attorneys General, Gregory M. Lievens, County Attorney, for appellee.

**ZAGER, Justice**.

On June 24, 2009, Mark Becker shot and killed Edward Thomas in a temporary high school weight room in Parkersburg, Iowa, in front of numerous high school students participating in summer workouts. Becker was charged with the crime of murder in the first degree in violation of sections 707.1 and 707.2(1) and (2) of the Iowa Code. Becker provided notice that he would be relying on the defense of insanity to the charge. The jury rejected the insanity defense and found Becker guilty of first-degree murder. Following the guilty verdict, the district court sentenced Becker to life in prison without the possibility of parole and ordered him to pay restitution to the victim's estate. He was also ordered to pay restitution for his attorney and expert witness fees. Becker has appealed his conviction and the imposition of expert witness fees. Becker claims the jury was improperly instructed on the insanity defense and that the jury should have been instructed regarding the consequences of a verdict of not guilty by reason of insanity. He also claims the restitution order for expert witness fees exceeded the statutory limitations. We transferred the case to the court of appeals which affirmed the conviction and restitution orders. Becker sought further review, which we granted. For the reasons set forth below, we affirm the district court.

## I. Background Facts and Proceedings.

Becker was born June 3, 1985. His mother testified that he was an active, friendly child but that he "started to withdraw a little bit" the summer after his freshman year of high school. He was active in sports, and Thomas was his high school football coach. After graduation from high school, he attended Wartburg College in Waverly, Iowa, for one semester. He left college and lived in various locations over the next

several years. During this time, according to his mother's testimony, Becker "continued to be more inward, more depressed, [and] very uncommunicative."

Becker began living with his parents outside of Parkersburg in July of 2008. In September, his parents awoke one night to Becker yelling. He was swearing at his parents and was acting very violently. At one point, he began hitting the basement walls with a baseball bat. His parents called the sheriff who testified that Becker claimed he had a metaphysical ESP connection with Thomas and that Thomas was sending him messages that were keeping him up at night. Becker was committed to a psychiatric unit the next day. He spent the next week in this facility and was released with a prescription for medication that his mother testified he took sporadically.

Over the next month, Becker began to have more frequent violent episodes. In November, he was arrested for an assault. His mother picked him up from jail, and on the way home, he began swearing at her and hit her while she was driving, breaking her glasses. When she attempted to call her husband, he grabbed her cell phone and broke it in half. As a result, Becker was again committed and spent another week in the hospital.

Following his discharge, Becker's parents rented a room for him in Waterloo. However, they were unable to afford the room, and he moved back to their home in February 2009. Becker continued to have difficulties, and his parents called the sheriff's department several times. In April, Cedar Valley Community Support Services became involved to provide support and assistance to Becker. It helped Becker get an apartment and a job in Waterloo. His relationship with his parents began to improve, and he would stop by and visit with them on occasion.

On June 20, Becker knocked at the front door of the residence of Dwight Rogers, a Cedar Falls resident. Though Rogers did not know Becker, Becker asked for Rogers by name. When Rogers asked Becker who he was, Becker responded, "[Y]ou know who the F I am." Rogers said he did not have a good feeling about the situation, so he closed the door and told his wife to call 911. He reopened the door and saw Becker approaching with a baseball bat. He closed the door again and was attempting to get Becker's license plate number when Becker swung the bat at Rogers's front door, breaking the storm door. The two struggled over the door, but Rogers was able to close it. Becker then broke a picture window and a garage door window before attempting to drive his car through the garage door. Becker left once law enforcement sirens became audible. He then led law enforcement officers on a high-speed chase that ended when he hit a deer.

Becker was arrested and taken to the Butler County Sheriff's Office. He was booked and interviewed and then sent to a psychiatric unit in Waterloo for evaluation. Law enforcement requested they be notified before Becker was released. He was evaluated on June 21, and the next day he was diagnosed with paranoid schizophrenia and given medication. On June 23, Becker requested he be released as he felt that he was better. A nurse indicated to Becker's doctor "that he seem[ed] to be doing much better," and following this conversation, Becker's doctor agreed to discharge him. Becker's service coordinator with Cedar Valley Community Support Services agreed to pick Becker up, and the doctor discharged him with prescriptions for medication. The sheriff was not notified.

Becker's keys had been taken by the police, so the service coordinator opened his apartment for him and made plans to get his

prescriptions filled the next day. About 9:30 that evening, however, Becker called his parents from a Waterloo Burger King and asked to be picked up so he could spend the night with them. They agreed, and Becker's mother came to Waterloo to pick him up. At that time, she felt that Becker seemed to be doing better than he had in quite some time.

Becker woke his father up at 4:30 a.m. on June 24, and they had coffee together. Becker's mother woke up around 5:00 a.m. and spoke with him for a few minutes. Becker's mother and father then left for work. Later they planned to pick up his prescriptions and check with the sheriff about getting Becker's keys back.

Sometime that morning, Becker pried open a gun cabinet in his parents' basement. He took a .22 caliber revolver and practiced shooting the gun at a birdhouse in his parents' yard. He later told officials that after his practice session he knew he would have to get close to Thomas in order to be sure that he hit him. Becker then reloaded the gun and found a spare set of keys for one his parents' cars and drove to Aplington. He knocked on the door of a residence and asked for Thomas by name. He was told Thomas did not live at that house. Becker then drove to Parkersburg where he asked a few people where he might find Thomas. Becker told one of these people that he needed to find Thomas because he was working with him on a tornado relief project. He was directed to the elementary school where he was told Thomas might be teaching driver's education.

Upon arrival at the elementary school, Becker left the gun in the car. He asked a family friend who worked as a custodian at the school where Thomas was. The custodian called a custodian at the high school who told him Thomas was in the weight room. This information was

relayed to Becker who, after some small talk, returned to his car and drove to the weight room.

Since the high school in Parkersburg had been damaged by a tornado, a makeshift weight room had been set up in a bus barn. Becker arrived at the weight room at about 7:45 a.m. Initially, he left the gun in the car. According to witnesses, he stuck his head in the door of the bus barn and looked around and left. Becker then retrieved the gun from his car and put it in the pocket of his coveralls.[1] He reentered the weight room, approached Thomas, took out the gun, and shot Thomas six times in the head, chest and leg. He proceeded to kick and stomp on Thomas, yelling, "Fuck you, old man." He then left the weight room screaming that he had killed Satan and telling people to go get his carcass. Thomas died from his injuries.

Becker drove away from the high school towards his parents' home. Witnesses had already reported the shooting and described the car Becker was driving. Since the car was registered to Becker's father, Sheriff Johnson headed to Becker's parents' home. As the sheriff approached the Becker residence, he could see a vehicle approaching. The vehicle turned in behind Johnson. The car followed Johnson into the driveway. Johnson accelerated, turned his vehicle at an angle for cover, and drew his weapon. As the car approached, Johnson saw an arm come out of the window. The driver was holding a handgun out of the window by the trigger guard. The vehicle stopped; Johnson ordered him to drop the gun; and Becker complied. Becker stepped out of the car and said, "I'm done, I'm done." Becker was handcuffed and taken into

---

[1]Becker stated to a doctor who examined him afterward that he wore coveralls because "the gun could fit easily into his pocket."

custody. He was interviewed by agents from the Division of Criminal Investigations and admitted shooting Thomas.

Becker was charged with first-degree murder by trial information on June 30, 2009. He provided notice of an insanity defense on July 13. Trial commenced on February 12, 2010. The State presented numerous witnesses who identified Becker as the shooter. The defense called numerous witnesses to testify to Becker's history of mental problems and his behavior in the days leading up to the shooting. The defense then called two psychiatrists who offered expert testimony that at the time of the shootings Becker was suffering from paranoid schizophrenia, and that, as a result, Becker did not know and understand the nature or consequences of his actions and was incapable of distinguishing right from wrong in relation to those actions. In rebuttal, the State called two of its own psychiatrists. They agreed Becker suffered from paranoid schizophrenia, but they testified that he nevertheless understood the nature and consequences of his action and knew right from wrong in relation to the acts he committed.

The case was submitted to the jury on February 24. The jury deliberated for several days and sent several questions to the district court, including one on February 26, in which they asked the judge what would happen if Becker were found not guilty by reason of insanity. The judge answered by referring the jurors to jury instruction 10 which told the jurors that it was their duty to determine guilt or innocence and that in the event of a guilty verdict, they would have nothing to do with punishment. Instruction 10 does not refer to the consequences of a not-guilty-by-reason-of-insanity verdict. However, in response to the jury's question, the court informed the jury that in the event of either a guilty verdict or a not-guilty-by-reason-of-insanity verdict, the jury would have

nothing to do with the consequences and that these were issues for the court, not the jury. On March 2, the jury returned a verdict of guilty. Becker filed a motion for a new trial on April 8, claiming, among other things, that the jury instructions on insanity the district court provided to the jury were inaccurate and misleading. Becker also reasserted his claim that the court should have instructed the jury of the consequences of a verdict of not guilty by reason of insanity. The trial court denied the motion and on April 14 sentenced Becker to life in prison without parole.

## II. Issues.

Becker appealed his conviction, claiming the district court improperly instructed the jury when it submitted the Iowa State Bar Association's jury instructions defining the elements of the insanity defense instead of the instruction Becker requested. He also claimed the district court violated his due process rights under the Iowa Constitution when it refused to instruct the jury as to the consequences of a not-guilty-by-reason-of-insanity verdict. Finally, Becker claims the restitution order, including the expert witness fees paid to Becker's expert witnesses, exceeded the maximum amount allowed by the statute. The court of appeals affirmed the district court's rulings on all three issues.

On further review, "we retain the discretion to consider all issues raised in the initial appeal." *State v. Doggett*, 687 N.W.2d 97, 99 (Iowa 2004). In exercising that discretion, we are allowed to let the court of appeals' decision on any particular issue stand as the final decision on that issue. *See id.*; *see also State v. Johnson*, 784 N.W.2d 192, 193–94 & n.1 (Iowa 2010). On further review, we address the two issues relating to the jury instructions and allow the court of appeals' opinion to stand as the final decision on the restitution issue.

**III. Standards of Review.**

Becker's claims on appeal both focus on the jury instructions. His first claim is that the instructions given by the district court did not accurately define insanity and that his own instruction should have been given. "We review challenges to jury instructions for correction of errors at law. 'We review the related claim that the trial court should have given the defendant's requested instructions for an abuse of discretion.' " *State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010) (citations omitted); *see also In re Det. of Palmer*, 691 N.W.2d 413, 416 (Iowa 2005) ("We also review a district court's failure to give a jury instruction for an abuse of discretion."). "An abuse of discretion occurs when the court's decision is based on a ground or reason that is clearly untenable or when the court's discretion is exercised to a clearly unreasonable degree." *Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 160 (Iowa 2004); *see also Summy v. City of Des Moines*, 708 N.W.2d 333, 339 (Iowa 2006).

We employ a different standard of review when a jury instruction implicates a constitutional right. "We review de novo a district court decision implicating a defendant's constitutional rights." *State v. Lyman*, 776 N.W.2d 865, 873 (Iowa 2010); *see also State v. Willard*, 756 N.W.2d 207, 211 (Iowa 2008); *State v. Nail*, 743 N.W.2d 535, 538 (Iowa 2007). Becker claims that article I, section 9 of the Iowa Constitution required the district court to instruct the jury that if it found Becker not guilty by reason of insanity, then he would be committed to a mental health institute for evaluation. Becker claims that failing to give the requested instruction violated his due process rights. Since Becker's claim regarding the failure to provide a consequence instruction implicates his constitutionally based due process rights, our review is de novo. *State v. Heemstra*, 721 N.W.2d 549, 553 (Iowa 2006) ("We review challenges to

jury instructions for correction of errors at law. To the extent [a jury instruction] error is based on constitutional grounds, our review is de novo." (citations omitted)).

"Error in giving or refusing to give a particular instruction warrants reversal unless the record shows the absence of prejudice." *Marin*, 788 N.W.2d at 836. If an error in giving or refusing to give a requested jury instruction violated a defendant's constitutional rights, then a "jury instruction error is presumed prejudicial unless 'the contrary appears beyond a reasonable doubt from a review of the whole case.'" *State v. Hanes*, 790 N.W.2d 545, 550 n.1 (Iowa 2010) (quoting *State v. Davis*, 228 N.W.2d 67, 73 (Iowa 1975), *overruled in part on other grounds by Hanes*, 790 N.W.2d at 550 n.1). When the error in giving or refusing to give a jury instruction is not of a constitutional dimension, "we presume prejudice and reverse unless the record affirmatively establishes there was no prejudice." *Id.* at 551. Under this test, prejudice will be found where the information given unquestionably had a powerful and prejudicial impact on the jury or where the instruction could reasonably have misled or misdirected the jury. *Id.*

## IV. The Jury Instructions Regarding the Insanity Defense.

In a criminal case, the district court is required to instruct the jury as to the law applicable to all material issues in the case. *Marin*, 788 N.W.2d at 837; *see also* Iowa R. Civ. P. 1.924 (requiring the district court to "instruct the jury as to the law applicable to all material issues in the case"); Iowa R. Crim. P. 2.19(5)(*f*) ("The rules relating to the instruction of juries in civil cases shall apply to the trial of criminal cases."). When reviewing jury instructions, we consider them as a whole, not separately. *State v. Fintel*, 689 N.W.2d 95, 104 (Iowa 2004) ("Jury instructions are not considered separately; they should be considered as a whole.").

Instructions must correctly state the law, but they do not need to "contain or mirror the precise language of the applicable statute." *State v. Schuler*, 774 N.W.2d 294, 298 (Iowa 2009). We have stated that "the court is required to give a party's requested instruction so long as it ' "states a correct rule of law having application to the facts of the case and when the concept is not otherwise embodied in other instructions." ' " *Marin*, 788 N.W.2d at 837 (quoting *Summy*, 708 N.W.2d at 340). However, we also note that "the court is not required to give any particular form of an instruction; rather, the court must merely give instructions that fairly state the law as applied to the facts of the case." *Id.* at 838; *see also State v. Veal*, 564 N.W.2d 797, 812 (Iowa 1997), *overruled in part on other grounds by State v. Hallum*, 585 N.W.2d 249, 253 (Iowa 1998), *vacated on other grounds*, 527 U.S. 1001, 119 S. Ct. 1335, 144 L. Ed. 2d 233 (1999) ("A trial court is . . . not required to instruct in the language of requested instructions so long as the topic is covered." (citation and internal quotation marks omitted)). We will begin our analysis of the instructions by defining the law of the defense of insanity in Iowa and then proceed to determine whether the instructions given, when read as a whole, fairly and correctly state the law on the issue.

Iowa courts first considered the proper instructions for an insanity defense in *State v. Felter*, 25 Iowa 67 (1868). *See The Defense of Insanity at the Time of the Act in Criminal Cases in Iowa*, Note, 32 Iowa L. Rev. 714, 720 (1947). For the next century, various judicially defined tests for insanity were used until, in 1976, the Iowa legislature codified Iowa's

insanity defense at what is now Iowa Code section 701.4 (2009). 1976 Iowa Acts ch. 1245(1), § 104.[2] The section now reads:

> A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act. If the defense of insanity is raised, the defendant must prove by a preponderance of the evidence that the defendant at the time of the crime suffered from such a deranged condition of the mind as to render the defendant incapable of knowing the nature and quality of the act the defendant was committing or was incapable of distinguishing between right and wrong in relation to the act.

Iowa Code § 701.4.[3] As used in the statute, "the words 'right' and 'wrong' . . . should be understood in their legal and not in their moral sense." *State v. Hamann*, 285 N.W.2d 180, 183 (Iowa 1979). Becker does not challenge the statutory definition itself; rather, he claims the jury instructions provided by the district court did not correctly state the law.

The district court submitted two instructions to the jury regarding the insanity defense, instructions 34 and 35. Instruction 34 was entitled "Insanity Defense" and read as follows:

> The Defendant claims he is not criminally accountable for his conduct by reason of insanity. A person is presumed sane and responsible for his acts.

> Not every kind or degree of mental disease or mental disorder will excuse a criminal act. "Insane" or "insanity"

---

[2]The only amendment to the statute occurred in 1984 when the legislature amended the statute to require the defendant to bear the burden of proving an insanity defense by a preponderance of the evidence. *See* 1984 Iowa Acts ch. 1320, § 1.

[3]We have recognized that section 701.4 is a codification of the *M'Naghten* rule for determining whether a defendant was insane at the time of the crime. *State v. Hamann*, 285 N.W.2d 180, 182 (Iowa 1979).

means such a diseased or deranged condition of the mind as to make a person either incapable of knowing or understanding the nature and quality of his acts, or incapable of distinguishing right and wrong in relation to the acts.

A person is "sane" if, at the time he committed the criminal act, he had sufficient mental capacity to know and understand the nature and quality of the act and had sufficient mental capacity and reason to distinguish right from wrong as to the particular act.

To know and understand the nature and quality of one's acts means a person is mentally aware of the particular acts being done and the ordinary and probable consequences of them.

Concerning the mental capacity of the Defendant to distinguish between right and wrong, you are not interested in his knowledge of moral judgments, as such, or the rightness or wrongness of things in general. Rather, you must determine the Defendant's knowledge of wrongness so far as the acts charged are concerned. This means mental capacity to know the acts were wrong when he committed them.

The Defendant must prove by a "preponderance of the evidence" that he was insane at the time of the commission of the crime.

Preponderance of the evidence is evidence that is more convincing than opposing evidence. Preponderance of the evidence does not depend upon the number of witnesses testifying on one side or the other.

Insanity need not exist for any specific length of time.

Becker made no objection to instruction 34 at trial and does not claim it was improper on appeal.

Instruction 35 was entitled "Elements of Insanity Defense" and it read as follows:

If the State has proved all of the elements of a crime, you should then determine if the Defendant has proved he was insane.

In order for the Defendant to establish he was insane, he must prove by a preponderance of the evidence either of the following:

1.　　At the time the crime was committed, the Defendant did not have sufficient mental capacity to know and understand the nature and quality of the acts he is accused of; or

2.　　At the time the crime was committed, the Defendant did not have the mental capacity to tell the difference between right and wrong as to the acts he is accused of.

If the Defendant has failed to prove either of the elements by a preponderance of the evidence, then the Defendant is guilty.

Both these instructions substantially mirror the Iowa State Bar Association's uniform jury instructions.[4] *See* Iowa State Bar Ass'n, Iowa Crim. Jury Instructions 200.10, .11 (2010). As we have noted in the past, "trial courts should generally adhere to the uniform instructions." *State v. Mitchell*, 568 N.W.2d 493, 501 (Iowa 1997). We will review the district court's decision to give instructions 34 and 35 for a correction of errors at law. *Marin*, 788 N.W.2d at 836.

Before trial, Becker requested the following instruction be given in place of instruction 35:

If the State has proved all of the elements of a crime, you should then determine if the defendant has proved he was insane.

In order for the defendant to establish he was insane, he must prove by a preponderance of the evidence either of the following:

---

[4]The only difference between the two is that Iowa Criminal Jury Instruction 200.11 has an additional paragraph that instruction 35 did not include. This paragraph reads, "If the defendant has proved either of these elements by a preponderance of the evidence, then the defendant is not guilty by reason of insanity." However, this paragraph is an incorrect statement of the law because the law requires more than simply proving one of the two alternatives listed in section 701.4. A defendant must also show that a diseased or deranged condition of the mind rendered him incapable of knowing the nature and quality of the act or that it was wrong. Iowa Code § 701.4. Thus this alteration made instruction 35 a more accurate statement of the law than the uniform instruction.

1. At the time the crime was committed, the defendant suffered from such a deranged condition of the mind as to render him incapable of knowing the nature and quality of the acts he is accused of; or

2. At the time the crime was committed, the defendant suffered from such a deranged condition of the mind as to render him incapable of distinguishing between right and wrong in relation to the act.

Insanity need not exist for any specific length of time before or after the commission of the act.

If the defendant has proved either of these elements by a preponderance of the evidence as explained in Instruction No. ___, then the defendant is not guilty by reason of insanity.

If the defendant has failed to prove either of the elements by a preponderance of the evidence, then the defendant is guilty.

We will review the district court's decision to give instruction 35 instead of Becker's proposed instruction for an abuse of discretion. *See Marin,* 788 N.W.2d 836.

As noted above, the statute states that:

A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. . . .

Iowa Code § 701.4. We note that Becker's proposed instruction accurately states all the elements of the insanity defense contained in section 701.4. Furthermore, we agree that Becker's proposed instruction is a succinct statement of the elements of section 701.4, and it more closely tracks the language found in that section. However, when reviewing the jury instructions that were actually given by a district court, the relevant inquiry is not whether the defendant's proposed

instruction more closely mirrors the statutory language at issue in the case. *See Schuler*, 774 N.W.2d at 298–99. Instead, we are trying to determine whether the instructions actually given by the district court accurately portray the applicable law to the jury. *Id.* Though instruction 35 used in this case is not a model of clarity, for the reasons set forth below, when read with instruction 34, it accurately and fairly stated the applicable law.

Section 701.4 requires that in order to be found not guilty by reason of insanity the defendant must show he was either (1) incapable of knowing the nature and quality of the act he is committing, or (2) incapable of distinguishing between right and wrong in relation to that act. Iowa Code § 701.4. The defendant must also show that a diseased or deranged condition of the mind rendered him incapable of having the relevant knowledge for making the relevant distinction. *See id.*

Instruction 34 read:

> Not every kind or degree of mental illness or mental disorder will excuse a criminal act. "Insane" or "insanity" means such a diseased or deranged condition of the mind as to make a person either incapable of knowing or understanding the nature and quality of his acts, or incapable of distinguishing right and wrong in relation to the acts.

This paragraph asks the jury to make the same three determinations as section 701.4 does. The first is whether the defendant suffered from "a diseased or deranged condition of the mind." There is overwhelming evidence in the record that Becker suffered from a diseased or deranged condition of the mind, and neither party argued to the jury that he did not. The second is whether that diseased or deranged condition of the mind made the defendant "incapable of knowing or understanding the

nature and quality of his acts." The third determination is whether that diseased or deranged condition of the mind made the defendant "incapable of distinguishing right and wrong in relation to the acts."

The third paragraph of instruction 34 indirectly explains when a defendant is "insane" by explaining when the defendant is "sane." It reads:

> A person is "sane" if, at the time he committed the criminal act, he had sufficient mental capacity to know and understand the nature and quality of the act and had sufficient mental capacity and reason to distinguish right from wrong as to the particular act.

Apart from a few linguistic changes, this paragraph rephrases the previous one, which, as noted above, tracks the Code. *See* Iowa Code § 701.4.

Paragraph three says a person is "sane" if he "had sufficient mental capacity" to do certain things, as opposed to the statute, which says a person is "insane" if he is "incapable" of doing those things. Iowa Code § 701.4. "Incapable" means "lacking capacity, ability, or qualification for the purpose or end in view." *Merriam–Webster's Collegiate Dictionary* 628 (11th ed. 2004). Thus, a person who is "incapable" of knowing or distinguishing would, by definition, "lack capacity" to know or distinguish. Put another way, a person who "lacks capacity" to know or distinguish would not "ha[ve] sufficient capacity" to know or distinguish, which is the language used in paragraph three of the model instruction and which is contained in instruction 34. *See* Iowa State Bar Ass'n., Iowa Crim. Jury Instruction 200.10.

The inquiry into the defendant's abilities under paragraphs two and three of instruction 34 is the same: Under both paragraphs, the jury must determine the defendant's mental capacity to (1) know and

understand the consequences of his actions, or (2) distinguish right from wrong in relation to those actions. Under paragraph two, if the defendant cannot perform either one of the two functions listed, and this inability is due to a "diseased or deranged condition of the mind," then the defendant is insane. If the jury determines, however, that the defendant did have the mental capacity to both know and understand the consequences of his actions *and* to distinguish right from wrong in relation to those actions, then the defendant is "sane." The change in phrasing does not change the task of the jury, and Becker does not contest the propriety of instruction 34.

This brings us to instruction 35, which is entitled "Elements of Insanity Defense." This instruction tells the jury that if the State has proven all the elements of the crime charged, then the jury must determine if the defendant was insane. The instruction then states, in relevant part,

> In order for the Defendant to establish he was insane, he must prove by a preponderance of the evidence either of the following:
>
> 1. At the time the crime was committed, the Defendant did not have sufficient mental capacity to know and understand the nature and quality of the acts he is accused of; or
>
> 2. At the time the crime was committed, the Defendant did not have the mental capacity to tell the difference between right and wrong as to the acts he is accused of.
>
> If the Defendant has failed to prove either of the elements by a preponderance of the evidence, then the Defendant is guilty.

Though standing alone it is an incomplete statement of the law, this instruction does not contain any inaccurate statements of the law.

By the time the jury reaches this instruction, it has already determined that the State proved all the elements of the crime of murder in the first degree beyond a reasonable doubt, and the jury is now considering the defense of insanity. Becker focuses on the fact that, unlike section 701.4, this instruction does not contain the term diseased or deranged condition of the mind, but instead uses the term mental capacity. Becker points out that "[t]he phrases 'diseased or deranged condition of the mind' and 'mental capacity' are not synonymous." However, the relevant inquiry is not whether diseased or deranged condition of the mind is synonymous with mental capacity; instead, we must determine whether the phrase "did not have sufficient mental capacity" or "did not have the capacity" are synonymous with the word incapable.

The statute requires a defendant to do more than show he suffers from a diseased or deranged condition of the mind. A defendant must also show that a diseased or deranged condition of the mind rendered the defendant incapable of knowing and understanding the nature and quality of his act or knowing right from wrong in relation to that act. *See* Iowa Code § 701.4. Instead of making diseased or deranged condition of the mind synonymous with mental capacity, instruction 35 omits the diseased or deranged condition of the mind element of section 701.4 completely. However, this omission means the instruction, if read by itself, is incomplete, not that it is incorrect. The instruction tells the jury that regardless of whether the defendant has shown that he has a diseased or deranged condition of the mind, which was not disputed in this case, the defendant must still prove by a preponderance of the evidence that he either did not have "sufficient mental capacity," which as noted above has substantially the same meaning as "incapable," to

know and understand the nature and quality of the acts he is accused of, *or* to tell the difference between right and wrong as to the acts he is accused of. If the defendant has failed to prove either of these elements by a preponderance of the evidence, then he is guilty.

Instruction 35 is accurate. If the defendant cannot show he did not have "sufficient mental capacity" or "the mental capacity" to make (i.e., he was "incapable" of making) one of the two relevant assessments contained in instruction 35, then the presence or absence of a diseased or deranged condition of the mind becomes completely irrelevant. *See* Iowa Code § 701.4 (requiring a defendant show a diseased or deranged condition of the mind *rendered him* incapable of making one of the two assessments contained in the section). Without proving one of the two elements listed in instruction 35, the insanity defense must fail, even if the defendant has a diseased or deranged condition of the mind. Simply put, instruction 35 tells the jury when the defense of insanity must fail for want of an element of the defense.

Jury instructions must be considered as a whole. *Fintel*, 689 N.W.2d at 104 ("Jury instructions are not considered separately; they should be considered as a whole.").[5] When read together, instructions 34 and 35 accurately and fairly stated the applicable law on the defense of insanity. Accordingly, the district court did not commit legal error when it gave instructions 34 and 35 to the jury. *Marin*, 788 N.W.2d 836 ("We review challenges to jury instructions for correction of errors at law.").

We also conclude that the district court did not abuse its discretion by refusing to give Becker's requested instruction in place of

---

[5]Instruction number 5 specifically advised the jury, "You must consider all of the instructions together. No one instruction includes all of the applicable law."

instruction 35. *Id.* (" 'We review the related claim that the trial court should have given the defendant's requested instructions for an abuse of discretion.' " (citation omitted)); *see also Palmer*, 691 N.W.2d at 416 ("We also review a district court's failure to give a jury instruction for an abuse of discretion."). Becker's requested instruction may have stated the law in a more coherent and concise manner than instruction 35, but jury instructions do not need to "contain or mirror the precise language of the applicable statute." *Schuler*, 774 N.W.2d at 298. Instruction 35, when read with instruction 34, accurately and completely stated the applicable law. When the instructions already accurately state the law, the defendant is not entitled to have his proposed instruction submitted to the jury. *See Marin*, 788 N.W.2d at 837. Accordingly, we cannot say that the district court's decision to give instruction 35 instead of Becker's proposed instruction was clearly unreasonable. *See Summy*, 708 N.W.2d at 339. Becker's instruction was an accurate, complete and succinct statement of section 701.4, and it would not have been improper for the district court to have utilized this instruction. Indeed, future appeals of this nature might be avoided by issuing an instruction like the one Becker requested; one that more closely mirrors the language found in section 701.4. *See State v. Janssen*, 239 N.W.2d 564, 567 (Iowa 1976) (noting that a change in the uniform instruction might avoid future appeals). However, it was not an abuse of discretion by the district court to utilize instruction 35, in conjunction with instruction 34, instead of Becker's proposed instruction.

**V. The District Court's Refusal to Instruct the Jury Regarding the Consequences of a Not-Guilty-by-Reason-of-Insanity Verdict.**

On February 19, 2010, and at the jury instruction conference prior to closing arguments, Becker requested the following jury instruction:

Punishment not for Jury. The duty of the jury is to determine if the defendant is guilty or not guilty.

In the event of a guilty verdict, you have nothing to do with punishment.

If you find a verdict of not guilty by reason of insanity, the defendant shall be immediately ordered committed to a state mental health institute or other appropriate facility for a complete psychiatric evaluation.

The trial court refused to give Becker's instruction and gave the following instruction, instruction number 10, in its place:

Duty of Jury. The duty of the Jury is to determine if the Defendant is guilty or not guilty.

In the event of a guilty verdict, you have nothing to do with punishment.[6]

On Friday, February 26, during the jury's deliberations, the jury foreman sent a note to the court asking, "What would happen to Mark Becker if we find him insane?" The court met with the attorneys for the State and Becker outside the presence of the jury and informed the attorneys of the jury's question. The court proposed the following answer:

Ladies and gentlemen of the jury:

You have asked the following question: "What would happen to Mark Becker if we find him insane?"

Answer: You need not concern yourself with the potential consequences of a verdict of not guilty by reason of insanity.

Please refer to Instruction Number 10. You must decide whether he is guilty or not guilty, and, if you decide he is guilty, you must then decide the issue of insanity.

In the event of a guilty verdict or a verdict of not guilty by reason of insanity, you have nothing to do with the

---

[6]The wording of instruction 10 is the same wording used in uniform instruction 100.13. *See* Iowa State Bar Ass'n, Iowa Crim. Jury Instructions 100.13.

consequences. Those are issues for the Court, not for the jury.

After the court read this proposed answer to the attorneys, the State indicated that it believed the "instruction accurately states the law." Becker's counsel agreed and did not renew its request that the jury be instructed about the consequences of a not-guilty-by-reason-of-insanity verdict.[7]

After the jury received the court's answer, deliberations continued through the afternoon. The jury told the court they had voted four times that day and were still deadlocked. Without objection from either party, the court adjourned the jury's deliberations for the weekend. On Monday morning, the jury was instructed by the court to continue its deliberations. The next day, the jury returned its verdict of guilty to murder in the first degree, rejecting the insanity defense.

Becker filed a motion for a new trial on April 8, 2010. He claimed the court erred by not giving the proposed instruction on the elements of insanity defense and the requested consequence instruction. At the April 14 hearing on the motion for new trial and sentencing, Becker argued that it was an error not to give his proposed consequence instruction, "particularly in light of the question asked by the jury." The State countered that the instruction requested by Becker was an incomplete statement of the consequences of a not-guilty-by-reason-of-insanity verdict, a point the district court had made when the issue was originally brought up before the instructions were given to the jury. The district court then denied the motion for a new trial.

---

[7]The State has claimed that error was not preserved on this issue by counsel's failure to renew its request for the consequence instruction.

At trial, Becker claimed his consequence instruction was necessary to protect his due process rights and his right to a fair trial guaranteed by article I, section 9 of the Iowa Constitution and the Fifth, Sixth and Fourteenth Amendments to the Federal Constitution. On appeal, Becker has abandoned his claims under the Federal Constitution and now asserts that "[t]he proposed instruction was required by due process and the right to a fair trial guaranteed by Article I, section 9 of the Iowa Constitution."

We begin our analysis by defining Becker's claim and the framework within which that claim should be evaluated. Article I, section 9 of the Iowa Constitution guarantees its citizens the right to a jury trial and provides that "no person shall be deprived of life, liberty, or property, without due process of law." "Due process requires fundamental fairness in a judicial proceeding." *In re Det. of Morrow*, 616 N.W.2d 544, 549 (Iowa 2000) (citation and internal quotation marks omitted). In order to satisfy due process, therefore, Becker's trial must not have been fundamentally unfair.[8] Becker claims that when a criminal defendant pleads not guilty by reason of insanity, and requests such a consequence instruction, the due process guarantee of a fundamentally fair trial contained in the Iowa Constitution requires the district court inform the jury that a defendant who is found not guilty by reason of insanity will be "immediately ordered committed to a state mental health institute or other appropriate facility for a complete psychiatric evaluation."[9]

---

[8]Becker's counsel acknowledged at oral argument that Becker's due process claims were based on concerns of fundamental fairness.

[9]We take this opportunity to note two features that are not present in this case. The first is that Becker did not request the jury be instructed as to all the consequences of a not-guilty-by-reason-of-insanity verdict that are set forth in Iowa Rule of Criminal Procedure 2.22(8). Becker's proposed instruction only covered part of the first sentence

Becker correctly points out that the United States Supreme Court has held that federal courts are not required to give an instruction explaining the consequences of a not-guilty-by-reason-of-insanity verdict. *See Shannon v. United States*, 512 U.S. 573, 575, 114 S. Ct. 2419, 2422, 129 L. Ed. 2d 459, 464 (1994). *Shannon* held that the instruction was not required "under the Insanity Defense Reform Act of 1984 or as a matter of general federal practice." *Id.* Becker also correctly notes that the Supreme Court has never decided the issue on constitutional grounds.[10] In the absence of direct guidance from the Supreme Court on this issue, Becker asks this court to apply the Iowa Constitution to his claim and find that failing to give a consequence instruction violated due process under the Iowa Constitution.

Our first step in addressing this claim is to identify the proper framework within which to evaluate Becker's argument. We have

_____

of rule 2.22(8)(*b*). Other consequences were omitted, including the fact that a defendant who is found not guilty by reason of insanity is entitled to a hearing after fifteen days and every sixty days thereafter and that the court must order the defendant released if it concludes that the defendant is no longer mentally ill and is no longer a danger to himself or others. *Id.* r. 2.22(8). During oral argument Becker argued as an alternative that due process required a full recitation of the provisions of rule 2.22(8). That issue is not properly before us. However, as discussed elsewhere in this opinion, due process does not mandate that either instruction be given simply because the defendant requests it.

We also note that Becker's appeal is not based on the fact that the court refused to give a consequence instruction in response to the jury's question. As we have already noted, Becker's request was made prior to jury deliberations, and Becker's attorney did not request the instruction be given in response to the jury's question regarding consequences.

[10]Becker also cites cases decided by lower federal courts holding that there is no constitutional underpinning to the theory that a consequence-of-insanity instruction is required. *See Bassik v. Scully*, 588 F. Supp. 895, 899 (E.D.N.Y. 1984); *see also United States ex rel. Hand v. Redman*, 416 F. Supp. 1109, 1111 (D. Del. 1976). We also note that other states have recognized that even those cases which require a consequence instruction do not do so based on a constitutional right. *See Robison v. State*, 888 S.W.2d 473, 476–77 & n.4 (Tex. Crim. App. 1994). Becker has not provided any case where a state has recognized a right to such an instruction on constitutional grounds.

repeatedly stated that we jealously reserve the right to develop our state constitutional provision in a fashion independent of the federal counterpart. *Zaber v. City of Dubuque*, 789 N.W.2d 634, 654 (Iowa 2010). It is unclear whether Becker argues that due process requires a consequence instruction whenever it is requested or whether his claim is based on the particular facts and circumstances of his case. Accordingly, we treat his appeal as both a categorical challenge to the failure to give the instruction and a challenge to the failure to give the instruction at his particular trial.

**A. The Categorical Challenge to the Failure to Give the Consequence Instruction.** Many of Becker's arguments in favor of a consequence instruction are not specific to the facts of his case. Because these general arguments could apply to any defendant asserting an insanity defense, we will treat these arguments as a categorical challenge to a district court's refusal to give a consequence instruction. We now turn to the question of whether due process requires a district court give a consequence instruction whenever the defendant requests one.

Becker has cited a list of cases supporting the proposition "that the Iowa Constitution provides significant protection of individual rights." However, only one of the cases cited by Becker, *State v. Cox*, 781 N.W.2d 757 (Iowa 2010), actually involved a due process claim. *See Cox*, 781 N.W.2d at 761, 768 (holding that the due process guarantee of "the Iowa Constitution prohibits admission of prior bad acts evidence based solely on general propensity"). *Cox* cited heavily to *State v. Reyes*, 744 N.W.2d 95 (Iowa 2008), and drew much of its analytical framework from that decision. *See Cox*, 781 N.W.2d at 761–64. In *Reyes*, we stated that when a "challenge is based on due process under the Iowa Constitution, [but the defendant] does not offer or suggest a framework different than

that under the United States Constitution[] . . . we consider the legal standard under the Iowa Constitution as identical to that under the United States Constitution." *Reyes*, 744 N.W.2d at 101. We have also stated in the past that when asking us to apply a different approach than that used by the Supreme Court, "counsel should do more than simply cite the correct provision of the Iowa Constitution." *State v. Effler*, 769 N.W.2d 880, 895 (Iowa 2009) (Appel, J., specially concurring). Even where a party has not provided a substantive standard independent of federal law, we reserve the right to apply the standard presented by the party in a fashion different than the federal cases. *See State v. Oliver*, 812 N.W.2d 636, 650–51 (Iowa 2012).

"Procedural due process protections act as a constraint on government action that infringes upon an individual's liberty interest, such as the freedom from physical restraint." *State v. Hernandez-Lopez*, 639 N.W.2d 226, 240 (Iowa 2002). "Due process [also] entitles a defendant to certain minimal basic procedural safeguards . . . ." *State v. McMullin*, 421 N.W.2d 517, 519 (Iowa 1988). We have addressed categorical procedural due process claims in the context of a criminal trial. In *Reyes*, we addressed whether a defendant's claim that Iowa Code section 701.11, which made evidence of prior sexual assaults involving the same victim admissible in sexual abuse prosecutions, violated a defendant's procedural due process rights. 744 N.W.2d at 101–02. In that case, as in this one, the defendant specifically referenced article I, section 9 of the Iowa Constitution, but did not provide a framework within which to evaluate his due process claim. *Id.* at 101. We stated that

> [w]hen evaluating the constitutionality of rules of evidence
> under due process attack, the traditional approach has
> been to invalidate an evidentiary rule only if it "violates

those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' which define 'the community's sense of fair play and decency.'" The United States Supreme Court has declared that courts should construe the category of evidentiary rules that violate this rule "very narrowly."

*Id.* (citations omitted). In determining the constitutionality of the statute, we looked to historical practice as well as the evolution of our approach to the admissibility of prior acts of sexual abuse over time. *Id.* at 101–02. We ultimately held "that a defendant's fundamental right to a fair trial is not jeopardized by the admission of such evidence." *Id.* at 102.

In *State v. Cox*, however, we were asked to review exactly the same statute that was at issue in *Reyes* under the Iowa Constitution. *Cox*, 781 N.W.2d at 761. However, while *Reyes* involved prior sexual assaults against the same victim, the prior assaults at issue in *Cox* were against different victims. *Id.* at 761–62. We cited *Reyes* for the idea that rules of evidence run afoul of due process when they violate fundamental concepts of justice which define the community's sense of fair play and decency. *Id.* at 764. We addressed Cox's argument that "Iowa courts have generally refused to accept the admission of propensity evidence, and therefore, Iowa Code section 701.11 violates a fundamental conception of justice under the Iowa Constitution." *Id.* We then discussed the historical disapproval of propensity evidence of this nature and the fundamental concerns of fairness raised by the admission of such evidence. *Id.* at 764–67. We were also concerned about the impact such evidence could have on the presumption of innocence, which is a fundamental component of due process. *Id.* at 766–67. We then concluded that "[b]ased on Iowa's history and the legal reasoning for prohibiting admission of propensity evidence out of fundamental

conceptions of fairness, . . . the Iowa Constitution prohibits admission of prior bad acts evidence based solely on general propensity." *Id.* at 768.

We also note that the Supreme Court has taken a more restrained approach when analyzing categorical due process challenges to criminal procedures. In *Medina v. California,* 505 U.S. 437, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992), the Supreme Court addressed "the proper analytical framework for determining whether California's allocation of the burden of proof in competency hearings comports with due process." 505 U.S. at 442–43, 112 S. Ct. at 2576, 120 L. Ed. 2d at 361. In that case, the Court was reviewing a California statute that "require[d] a defendant who alleges incompetence to stand trial to bear the burden of proving so by a preponderance of the evidence." *Id.* at 439, 112 S. Ct. at 2574, 120 L. Ed. 2d at 359. The defendant advocated for the use of a balancing test like the one used in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), to determine whether the statute satisfied procedural due process. *Id.* at 442–43, 112 S. Ct. at 2576, 120 L. Ed. 2d at 361. The *Mathews* test would require the balancing of three factors:

> (1) the private interest that will be affected by the government action; (2) the risk of the erroneous deprivation of the interest, and the probable value of additional procedures; and (3) the government interest in the regulation, including the burdens imposed by additional procedures.

*Hernandez–Lopez*, 639 N.W.2d at 240. In rejecting the use of a balancing test, the Supreme Court stated,

> In our view, the *Mathews* balancing test does not provide the appropriate framework for assessing the validity of state procedural rules which, like the one at bar, are part of the criminal process.

In the field of criminal law, we "have defined the category of infractions that violate 'fundamental fairness' very narrowly" based on the recognition that, "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order. As we said in *Spencer v. Texas*, 385 U.S. 554, 564, 87 S. Ct. 648, 653, 17 L. Ed. 2d 606 (1967), "it has never been thought that [decisions under the Due Process Clause] establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure."

*Medina*, 505 U.S. at 443–44, 112 S. Ct. at 2576, 120 L. Ed. 2d at 361–62 (citations omitted).

The *Medina* court recognized history and contemporaneous practice in its due process analysis. The *Medina* court recognized, however, that contemporary practice has "limited relevance to the due process inquiry." 505 U.S. at 447, 112 S. Ct. at 2578, 120 L. Ed. 2d at 364. Further, although the *Medina* court canvassed history in some detail, it did not end its analysis with historical inquiry, but next turned to consideration of whether the challenged approach "transgresses any recognized principle of 'fundamental fairness.' " *Id.* at 448, 112 S. Ct. at 2578, 120 L. Ed. 2d at 365. While *Medina* thus discusses history and contemporaneous practice as factors, the touchstone of due process analysis remains fundamental fairness.

Instead of the balancing test described in *Mathews*, the Court felt that in the criminal context, a narrower inquiry was more appropriate. Specifically, the Court stated

it is normally "within the power of the State to regulate procedures under which its laws are carried out . . ." and its decision in this regard is not subject to proscription under the Due Process Clause unless "it offends some principle of

justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."

*Id.* at 445, 112 S. Ct. 2577, 120 L. Ed. 2d at 363 (citations and internal quotation marks omitted). The Court also noted that "the States have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, [and] it is appropriate to exercise substantial deference to legislative judgments in this area." *Id.* at 445–46, 112 S. Ct. at 2577, 120 L. Ed. 2d at 363.

Neither party has cited to any cases that undertake a thorough due process analysis of the categorical challenge presented in this case. However, the Oregon Court of Appeals was asked to evaluate a related challenge in *State v. Amini*, 28 P.3d 1204 (Or. Ct. App. 2001). Though *Amini* addresses a due process and fair trial challenge to a statute *requiring* the instruction instead of a judicial rule prohibiting it, the methodology used is instructive. *See Amini*, 28 P.3d at 1206.

When a defendant pleads guilty except for insanity, Oregon law requires the court to instruct the jury of the postacquittal consequence of a successful not-guilty-by-reason-of-insanity verdict. Or. Rev. Stat. Ann. § 161.313 (West, Westlaw through 2012 Reg. Sess.). In *Amini*, the defendant sought to have his convictions reversed, claiming the trial court violated his right to a fair trial under the Oregon and United States Constitutions when it instructed the jury according to the statute. *Amini*, 28 P.3d at 1206. Initially, the court of appeals reversed, finding Amini's right to a trial by an impartial jury under the Oregon Constitution had been violated. *See State v. Amini*, 963 P.2d 65, 72 (Or. Ct. App. 1998), *rev'd*, 15 P.3d 541, 542 (Or. 2000). The Oregon Supreme Court reversed the court of appeals decision as to the Oregon Constitution finding

> [the] instruction had no tendency to deny defendant a trial by a jury that is free of preconceptions about defendant's guilt, that is not subject to improper outside influences, and that evaluates the evidence that is introduced at trial based on the jury instructions that the trial court provides.

*Amini*, 15 P.3d at 547. The court remanded the case to the court of appeals to consider Amini's claims under the Sixth and Fourteenth Amendments to the Federal Constitution. *Id.*

On remand, the court of appeals framed Amini's challenge as "whether the statute's requirements, when complied with, necessarily prevent a defendant from having a fair trial." *Amini*, 28 P.3d at 1208. After noting that the right to a fair trial was a fundamental one, the court stated "[t]he question, then, becomes whether the giving of an instruction that tells the jury about the consequences of one of the three potential verdicts necessarily made defendant's trial and his subsequent conviction constitutionally infirm." *Id.* at 1208–09. The court then cited to numerous United States Supreme Court cases, including *Medina*, that limit the role of the Due Process Clause in dictating criminal procedures. *Id.* at 1209. The court also noted that

> "[j]udges are not free in defining 'due process' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' . . . [They] are to determine only whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions' and which define the 'community's sense of fair play and decency.' "

*Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 353, 110 S. Ct. 668, 107 L. Ed. 2d 708, 720 (1990)). Following these precedents, the court then looked to historical traditions and notions of fundamental fairness that define the community sense of fair play about which there can be no reasonable disagreement. *Id.* at 1210. The court then noted that there was no historical tradition of prohibiting the instruction and that there

was reasonable disagreement over whether such an instruction was helpful or detrimental to a defendant. *Id.* at 1212. The court ultimately concluded that even though jurors were generally not informed on the consequences of their verdicts, a statute that departed from that common law rule and required the court to give them just that sort of information was not constitutionally infirm. *Id.* at 1212–13.

Our approach to procedural due process challenges to a particular practice in a criminal proceeding is similar to the one taken by the Oregon Court of Appeals, as well as the United States Supreme Court. Each requires us to first examine subjective, open-ended considerations, such as fair play and fundamental concepts of justice. Also, each test takes into account more objective factors, such as historical practice and contemporary consensus. These principles are the generally accepted means of determining whether a particular criminal practice violates due process. *See generally* 1 Wayne R. LaFave, et al, *Criminal Procedure*, § 2.7(c), 685–713 (3d ed. 2007) (describing due process methodology).

The question, then, becomes whether the district court's refusal to provide the jury with the proposed consequence instruction necessarily denied Becker a fair trial and made his subsequent conviction constitutionally infirm. We will apply the principles set forth above to Becker's claim that the district court's refusal to instruct the jury that he would be committed for evaluation purposes if he were found not guilty by reason of insanity violated the principles of due process contained in the Iowa Constitution.

We begin by noting that instructing the jury of the consequences of a not-guilty-by-reason-of-insanity verdict has no historical basis in Iowa. As Becker notes, our caselaw has consistently rejected the necessity of such an instruction. *See State v. Oppelt,* 329 N.W.2d 17, 21 (Iowa 1983);

*State v. Hamann*, 285 N.W.2d 180, 185–86 (Iowa 1979); *State v. Fetters*, 562 N.W.2d 770, 775–76 (Iowa Ct. App. 1997). In *Hamann*, this court was asked to answer exactly the same question Becker poses today. Like Becker, Hamann requested an instruction on the consequences of a not-guilty-by-reason-of-insanity verdict. *Hamann*, 285 N.W.2d at 185. Though this court was divided on other issues presented by Hamann's appeal, we unanimously agreed that giving the instruction would have been improper. *Id.* at 185–86, 190.

We recognized then that, though a majority of states refused to require the instruction, there was a split of authority on the issue and that "[a] number of jurisdictions have adopted what is known as the *Lyles* rule." *Id.* at 186 (discussing *Lyles v. United States*, 254 F.2d 725 (D.C. Cir. 1957), an early case requiring the instruction in the District of Columbia). We acknowledged *Lyles*'s principal argument:

> *Lyles* recognizes that jurors are aware of the results of guilty and not guilty verdicts. But a not guilty by reason of insanity verdict has no commonly understood meaning. The *Lyles* court reasoned that "the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts."

*Id.* (quoting *Lyles*, 254 F.2d at 728). However, we noted that there were "[t]wo principal reasons" not to adopt the *Lyles* reasoning. *Id.* "The first is that such information is irrelevant to the jury's proper function, the determination of the insanity issue. The second reason is that the information would invite a compromise verdict." *Id.* (citing Wayne R. LaFave & Austin W. Scott, *Handbook on Criminal Law* 316 (1972)).

We then declined to adopt the *Lyles* rule. *Id.* In doing so, we cited to what is now Iowa Rule of Criminal Procedure 2.22(8), which describes

postverdict consequences of a not-guilty-by-reason-of-insanity verdict.[11]
*Id.* We noted that under this rule, "Iowa law clearly states that the disposition of a criminal defendant acquitted on a defense of insanity is a matter for the court, not the jury, to determine." *Id.* Since the jury did not play a role in postacquittal proceedings,

> an instruction to the jury regarding the post-trial disposition of a defendant found not guilty by reason of insanity is irrelevant to the jury's proper function. It could only serve to confuse the jury or invite it to consider improperly defendant's post-trial disposition. A jury might improperly consider defendant's post-trial disposition even in the absence of an instruction on that subject. But this does not justify our aiding and abetting it in that role. Rather, such a possibility merely tends to illustrate the necessity of precisely informing the jury of its proper function.

*Id.* We then concluded that "[t]here was no error in the trial court's refusal to grant defendant's requested instruction on a defendant's disposition after acquittal on the ground of insanity." *Id.*

In *Oppelt*, the trial court refused to give the following instruction after it was requested by the defendant:

> In the event of a verdict of not guilty by reason of insanity, you have nothing to do with the commitment of the defendant to a hospital for treatment. Iowa law specifies the process by which the mentally ill who are determined to be seriously mentally impaired and a danger to themselves or others are involuntarily hospitalized. That decision rests solely with the Court.

329 N.W.2d at 21. We adhered to the rule announced in *Hamann* and held "that refusal of such an instruction is not error." *Id.* The court of appeals has also failed to reverse convictions when the district court failed or refused to give an instruction like the one Becker requested.

---

[11]The relevant Iowa law has not changed since *Hamann* was decided. Under the current version of rule 2.22(8), the disposition of a defendant acquitted on an insanity defense is still a matter of concern for the court and not the jury. Iowa R. Crim. P. 2.22(8).

*See State v. Kehoe*, 804 N.W.2d 302, 311–12 (Iowa Ct. App. 2011); *Fetters*, 562 N.W.2d at 776. Our precedent has established that as a general rule, a district court's refusal to give a consequence instruction is not error.

The Supreme Court has also found a trial court did not err by refusing to instruct the jury as to the consequences of a not-guilty-by-reason-of-insanity verdict. *See Shannon*, 512 U.S. at 575, 114 S. Ct. at 2422, 129 L. Ed. 2d at 464. The Court recognized some "familiar precepts" regarding the jury's role:

> It is well established that when a jury has no sentencing function, it should be admonished to "reach its verdict without regard to what sentence might be imposed." The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

*Id.* at 579, 114 S. Ct. at 2424, 129 L. Ed. 2d at 466–67 (citations and footnotes omitted). Though the challenge in *Shannon* was not based on due process concerns, the reasoning adopted by the Court is still instructive as to whether due process requires the instruction Becker requested in this case.

Limiting the jury's role to factfinding without regard to the consequences is the rule, and not the exception, within our judicial system. As we said in *Hanes*,

> It is well-settled that juries should not be instructed regarding the statutory penalty for the charged offenses. As

the court of appeals has explained, "a trial has one purpose—to seek the truth," and "[p]enalties have nothing to do with the factual determination that a defendant did or did not commit a crime." It is the legislature, and not the jury, that determines the appropriate penalty for the crime. "[K]nowledge of the penalty would only serve to confuse and distract the jury from its unique and important judicial function."

790 N.W.2d at 549 (citations omitted). Some courts have disapproved of analogizing the consequences of telling a jury of the consequences of a not-guilty-by-reason-of-insanity verdict with telling the jury of the penalties for a guilty verdict. For example, in *State v. Babin*, 319 So.2d 367 (La. 1975), the Louisiana Supreme Court noted,

> Instructions on the post-verdict status of a not guilty by reason of insanity acquittal are not properly analogous to instructions on post-conviction sentencing, because as was stated in the dissent in this case on original hearing, instructions as to a sentence following a guilty verdict concern only the length of the defendant's incarceration, whereas possible confusion in a juror's mind as to the ramifications of a verdict of not guilty by reason of insanity pertains to the very nature of the defendant's disposition, i.e., whether or not he will be detained and the circumstances of his detention.

319 So 2d at 380.

We recognize that confinement following a not-guilty-by-reason-of-insanity verdict is not "punishment." *Cf. In re Det. of Garren*, 620 N.W.2d 275, 280–82 (Iowa 2000) (noting that civil commitment of sexually violent predators was for purposes of treatment, not punishment). However, some of the principles articulated in *Hanes* and cases like it are still applicable: The jury's role is to find facts and informing them of postverdict considerations would only confuse the jury and distract it from its factfinding function.

Applying the analysis in *Medina*, and other recognized due process analyses, we conclude that there is no historical tradition of requiring a

consequence instruction in all cases involving a defense of not guilty by reason of insanity. Jury instructions as to consequences of verdicts are disfavored generally, and they have been specifically rejected in the context of a verdict of not guilty by reason of insanity.

Having determined there is no historical basis for the instruction, we now address whether there is a contemporary consensus as to whether such an instruction is required. *Medina* characterizes contemporary practice as having "limited relevance" in due process analysis of substantive criminal procedures. 505 U.S. at 447, 112 S. Ct. at 2578, 120 L. Ed. 2d at 364. We note at the outset that there is not a consensus that due process or a fair trial requires such an instruction. Becker has not provided us with any case in which a court has determined that due process principles require a consequence instruction. The cases cited by Becker actually indicate that there is no constitutional basis for requiring such an instruction. *See U.S. ex rel. Hand v. Redman*, 416 F. Supp. 1109, 1111 (D. Del. 1976). The courts which have addressed the issue from a constitutional dimension have determined that there is no due process violation for failing to require such an instruction. *See, e.g., Robison v. State*, 888 S.W.2d 473, 476–77 & n.4 (Tex. Crim. App. 1994) (en banc) ("[W]e fail to see where the policy decisions of our sister courts throughout the union are ever raised to the level of a due process right or a due course of law right."); *see also State v. Neely*, 819 P.2d 249, 256–57 (N.M. 1991); *State v. Stoudamire*, 631 P.2d 1028, 1031 (Wash. Ct. App. 1981). Additionally, one court specifically held the failure to give the instruction does not make a trial

"fundamentally unfair." *Campbell v. State*, 515 S.W.2d 453, 456 (Mo. 1974).[12]

There are many jurisdictions which require a consequence instruction, even though the Due Process Clause is not used to justify the requirement. Twenty-four jurisdictions require an instruction like the one Becker requested be given.[13] However, this includes a compilation of established criminal jury instructions, court supervisory orders, and rules of criminal procedure. About one-third of the

---

[12]Campbell acknowledged that at the time of his trial, there was no requirement to issue a consequence instruction on the request of the accused. *Campbell v. State*, 515 S.W.2d 453, 456 (Mo. 1974). However, the court acknowledged that Missouri had amended its statute to require the giving of a consequence instruction in cases involving mental disease or defect excusing responsibility. *See id.*; *see also* Mo. Ann. Stat. § 552.030(6) (West, Westlaw current through 2012 Reg. Sess.). Section 552.030(6) states in part, "At the request of the defense the jury shall be instructed by the court as to the contents of subsection 2 of section 552.040." Subsection 552.040(2) sets forth the Missouri commitment procedures following an acquittal on the ground of mental disease or defect. *Id.* § 552.040(2).

[13]*Schade v. State*, 512 P.2d 907, 918 (Alaska 1973); *People v. Moore*, 211 Cal. Rptr. 856, 866 (Ct. App. 1985); *People v. Thomson*, 591 P.2d 1031, 1032 (Colo. 1979) (en banc); *State v. Wood*, 545 A.2d 1026, 1034–36 (Conn. 1988); *Jones v. United States*, 432 A.2d 364, 374 n. 21 (D.C. 1981), *aff'd,* 463 U.S. 354, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983) (noting that Criminal Jury Instruction for the District of Columbia, No. 5.11 (3d ed. 1978), which is given whenever a defendant claims insanity, informs the jury of the consequences of a not-guilty-by-reason-of-insanity verdict); *Roberts v. State*, 335 So. 2d 285, 288 (Fla. 1976) (adopting the *Lyles* rule); *Spraggins v. State*, 364 S.E.2d 861, 863 (Ga. 1988); *State v. Amorin*, 574 P.2d 895, 898–99 (Haw. 1978); *Georgopulos v. State*, 735 N.E.2d 1138, 1143 (Ind. 2000) (requiring the instruction under article seven, section four of the Indiana Constitution (the court's supervisory responsibilities)); *State v. Alexander*, 729 P.2d 1126, 1135–36 (Kan. 1986); *Babin*, 319 So. 2d at 380; *Erdman v. State*, 553 A.2d 244, 250 (Md. 1989); *Commonwealth v. Biancardi*, 656 N.E.2d 1234, 1234 (Mass. 1995); *Campbell*, 515 S.W.2d at 456; *Blake v. State*, 121 P.3d 567, 575–76 (Nev. 2005) (en banc) (stating that the instruction should be given, but a failure to do so does not warrant reversal unless prejudice is shown); *State v. Lister*, 448 A.2d 395, 399 (N.H. 1982) (citing *Novosel v. Helgemoe*, 384 A.2d 124, 130 (N.H. 1978)); *State v. Krol*, 344 A.2d 289, 304–05 (N.J. 1975); *People v. Hays*, 517 N.Y.S.2d 775, 777 (App. Div. 1987); *State v. Hammonds*, 224 S.E.2d 595, 603–04 (N.C. 1976); *State v. George*, 97 P.3d 656, 662 (Or. 2004) (en banc); *Commonwealth v. Mulgrew*, 380 A.2d 349, 350 (Pa. 1977); *Glasscock v. State*, 570 S.W.2d 354, 356 (Tenn. Crim. App. 1978); *State v. Shickles*, 760 P.2d 291, 298 (Utah 1988), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484, 489 (Utah 1997); *State v. Nuckolls*, 273 S.E.2d 87, 90–91 (W. Va. 1980).

jurisdictions which require the instruction have specific statutes mandating the practice.[14]  However, a slight majority of states do not require a consequence instruction, or else only allow the instruction where the consequences of a not-guilty-by-reason-of-insanity verdict are inaccurately portrayed to the jury by the prosecutor or defense counsel.[15]

---

[14] *Wood*, 545 A.2d at 1035–36 (noting that, under common law rules, Connecticut courts did not require the instruction, *see State v. Holmquist*, 376 A.2d 1111, 1113–14 (Conn. 1977), but that the instruction is currently required by statute); *Spraggins*, 364 S.E.2d at 863 (noting that instruction is required by statute); *Cooper v. State*, 325 S.E.2d 137, 139–40 (Ga. 1985) (holding a consequence instruction is not necessary because the consequences of the verdict "have no bearing upon the guilt or innocence of the defendant"); *Amorin*, 574 P.2d at 898–99; *Alexander*, 729 P.2d at 1135–36 (approving of the instruction required by statute); *Babin*, 319 So.2d at 380 (holding "the fairly explicit dictate" of the Louisiana Criminal Code required the instruction as opposed to earlier cases such as *State v. Plaisance*, 210 So.2d 323, 326–27 (La. 1968), which held such an instruction was unnecessary); *Campbell*, 515 S.W.2d at 456 (recognizing that Missouri requires an instruction by statute); *People v. Bassik*, 425 N.E.2d 873, 874 (N.Y. 1981); *George*, 97 P.3d at 662; *Glasscock*, 570 S.W.2d at 356.

[15] *Tankersley v. State*, 724 So.2d 557, 563–64 (Ala. Crim. App. 1998) (requiring the instruction only if the jury has been given the impression that the defendant would go free if acquitted by reason of insanity); *State v. Moody*, 94 P.3d 1119, 1164 (Ariz. 2004) (en banc); *Burns v. State*, 913 S.W.2d 789, 791 (Ark. 1996); *Aizupitis v. State*, 699 A.2d 1092, 1094–95 (Del. 1997) ("This Court has decided to adhere to Delaware's well-established precedents which do not require the trial court to give an instruction to the jury on the effect of a verdict of NGRI [not guilty by reason of insanity]."); *State v. Gratiot*, 663 P.2d 1084, 1086–88 (Idaho 1983); *People v. McDonald*, 769 N.E.2d 1008, 1020 (Ill. App. Ct. 2002); *Oppelt*, 329 N.W.2d at 20–21; *Payne v. Commonwealth*, 623 S.W.2d 867, 870 (Ky. 1981) ("The main function of the jury is to determine guilt or innocence.  The constitutional right to a trial by jury is limited to that determination. The consideration of future consequences such as treatment, civil commitment, probation, shock probation, and parole have no place in the jury's finding of fact and may serve to distort it.  For that reason, we now hold that neither the prosecutor, defense counsel, nor the court may make any comment about the consequences of a particular verdict at any time during a criminal trial."); *State v. Okie*, 987 A.2d 495, 497–500 (Me. 2010); *People v. Goad*, 364 N.W.2d 584, 589–90 (Mich. 1984) (not requiring the instruction because it would be impossible to fully explain the "consequences" of an NGRI verdict because they are contingent on future events); *State v. Bott*, 246 N.W.2d 48, 52–53 (Minn. 1976); *Emanuel v. State*, 412 So.2d 1187, 1190 (Miss. 1982); *State v. Buckman*, 630 P.2d 743, 748 (Mont. 1981); *State v. Ryan*, 444 N.W.2d 610, 631–32 (Neb. 1989); *Neely*, 819 P.2d at 256–57(due process did not require a consequence instruction); *State v. Huber*, 361 N.W.2d 236, 238–39 (N.D. 1985); *State v. Rogers*, 478 N.E.2d 984, 992 (Ohio 1985), *judgment vacated on other grounds*, 474 U.S. 1002, 106 S. Ct. 518, 88 L. Ed. 2d 452 (1985); *Nauni v. State*, 670 P.2d 126, 134 (Okla. Crim. App. 1983); *State v. Arpin*, 410 A.2d 1340, 1352 (R.I. 1980); *State v. Huiett*, 246 S.E.2d 862, 864 (S.C. 1978) (allowing a curative instruction only); *State v. Martin*,

Becker has not argued that this occurred in this case, and there is nothing in the record to indicate this occurred. This split of authority, which was recognized in *Amini* and many other subsequent cases, weighs against a determination that a consequence instruction is required by due process. However, the Supreme Court has noted that there is a difference between instructions that are "universally condemned" and those that are constitutionally defective. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S. Ct. 396, 400, 38 L. Ed. 2d 368, 373 (1973) ("Before a federal court may overturn a conviction resulting from a state trial in which [a particular instruction] was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.").

We again note that no state or federal court has found the giving or not giving of a consequence instruction violates due process. Since the instruction at issue in this case has not garnered the support of a majority of jurisdictions, we cannot say that there is a community consensus on this issue such that due process mandates the instruction

---

683 N.W.2d 399, 407 (S.D. 2004); *Robison*, 888 S.W.2d at 476–77; *State v. Percy*, 507 A.2d 955, 957–58 (Vt. 1986) (discussing and reaffirming the Vermont Supreme Court's holding in *State v. Smith*, 396 A.2d 126, 129 (Vt. 1978), to refuse, as a general rule, to require the instruction); *Kitze v. Commonwealth*, 435 S.E.2d 583, 586 (Va. 1993) (holding that failure to give a curative instruction if the prosecution made incorrect statements regarding the consequences of an insanity acquittal can result in the case being overturned); *Spruill v. Commonwealth*, 271 S.E.2d 419, 426 (Va. 1980) (holding that a consequence instruction was properly refused); *State v. McDonald*, 571 P.2d 930, 938 (Wash. 1977) (en banc), *overruled on other grounds by State v. Sommerville*, 760 P.2d 932, 936 (Wash. 1988); *Stoudamire*, 631 P.2d at 1031 (rejecting a due process and fundamental fairness argument and continuing to hold the instruction is unnecessary for the reasons set forth in *McDonald*); *Haynes v. State*, 186 P.3d 1204, 1210–12 (Wyo. 2008) (noting that a prosecutor's question regarding the consequences of a not-guilty-by-reason-of-insanity verdict was "highly improper" but concluding that reversal was unwarranted in light of the trial court's instruction that the disposition of the defendant was of "no concern to the jury"); *Lonquest v. State*, 495 P.2d 575, 584 (Wyo. 1972).

be given.  At least one commentator has stated that informing the jury of the consequence is "the better view."  1 Wayne R. LaFave, *Substantive Criminal Law* § 8.3(d), at 607 (2d ed. 2003).  LaFave agrees that many jurisdictions do not require an instruction and notes that "[t]he questionable explanation for [the majority] position is that such an instruction would distract the jury from the insanity issue and would invite compromise verdicts."  *Id.*  However "questionable" this explanation might be, it has nevertheless garnered the support of a number of courts, including our own.  *See Hamann*, 285 N.W.2d at 186.

We also note that there are many other commentators, researchers, academics, and law students who believe the best practice is to give the instruction whenever it is requested by the defendant.  *See, e.g.*, 1 Wayne R. LaFave, *Substantive Criminal Law*, § 8.3(d), at 607 ("The better view is [that the instruction should be given], for, as explained in *Lyles v. United States*, it does not make sense that a jury should be presented with three verdict choices (guilty, not guilty, and not guilty by reason of insanity) but know the consequences of only the first two." (footnotes omitted)); *see also* ABA Standards for Criminal Justice § 7–6.8, commentary (2d ed. 1986); Christopher J. Rauscher, *"I Did Not Want a Mad Dog Released"—the Results of Imperfect Ignorance: Lack of Jury Instructions Regarding the Consequences of an Insanity Verdict in* State v. Okie, 63 Me. L. Rev. 593, 613 (2011) (arguing the Maine Supreme Court should have "allowed the instruction because 'it can do some good and it can never do any harm.'" (internal citation omitted)).  Becker has provided us with one such note.  Masha Bach, Note, *The Not Guilty by Reason of Insanity Verdict: Should Juries Be Informed of Its Consequences?*, 16 Whittier L. Rev. 645, 646 (1995).  There have been many studies done on jurors' often mistaken attitudes towards the

insanity defense in general. *See, e.g.,* Eric Silver et al., *Demythologizing Inaccurate Perceptions of the Insanity Defense*, 18 Law & Hum. Behav. 63, 68 (Feb. 1994) ("[T]he public overestimates the extent to which insanity acquittees are released upon acquittal and underestimates the extent to which they are hospitalized as well as the length of confinement of insanity acquittees who are sent to mental hospitals."). Jurors' refusals to follow the directions given to them by the judge have also been explored. Jennifer L. Skeem, et al., *Venirepersons's Attitudes Toward the Insanity Defense: Developing, Refining, and Validating a Scale*, 28 Law & Hum. Behav. 623, 625 (Dec. 2004) (noting that in one study jurors who were "told to use their own 'best lights' to decide the case produce verdict patterns similar to those of mock jurors who receive various insanity test instructions"). Clearly, there are many policy concerns implicated by consequence jury instructions and the insanity defense.

Some jurisdictions which require a consequence instruction have acknowledged that their decision to require the instruction is guided by policy considerations. *See Erdman v. State*, 553 A.2d 244, 250 (Md. 1989) ("We are guided, as was the ABA, by common sense and policy considerations rather than by a doctrine outmoded by our present law."); *see also* ABA Standards for Criminal Justice § 7–6.8, commentary (favoring the giving of a consequence instruction, but noting that because of "the absence of solid empirical data supporting either view, common sense and policy considerations must provide guidance." (footnote omitted)). While there are policy arguments that favor informing jurors of the consequences of a not-guilty-by-reason-of-insanity verdict when requested by the defendant, as noted above, there are also policy reasons to refuse to give a consequence instruction.

However, good public policy is a far more malleable standard than due process. Thus, in evaluating Becker's claim that refusal to give the requested instruction violated his due process rights, we are not required to determine whether the general practice of not giving the instruction is the *best* policy; we need only be assured that failure to give the instruction is not constitutionally infirm. Debates as to which policy is *best*, as opposed to whether a practice is constitutionally acceptable, are better left in the province of the legislature and the rulemaking process. *See Hawkeye Foodservice Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 608 (Iowa 2012) (noting that the rulemaking "process permits policy considerations to be raised, studied, and argued in the legal community and the community at large" (citation and internal quotation marks omitted)). Our legislature has not seen fit to enact a statute implementing this policy. *See, e.g.*, Mo. Ann. Stat. § 552.030(6) (West, Westlaw current through 2012 Reg. Sess.) ("At the request of the defense the jury shall be instructed by the court as to the [commitment procedures following an acquittal on the ground of mental disease or defect].").[16] By leaving the decision to require a consequence instruction in the hands of the legislative or rulemaking processes, we ensure that the law can be adapted as new research on the issue becomes available.

The Delaware Supreme Court noted,

> This court is cognizant that the common law must not remain static and that our nation's constitutional forms of democracy have entrusted the judiciary with developing that body of jurisprudence. Conversely, the decision to make the

---

[16]For other examples of guidance from the legislature regarding jury instructions, see Iowa Code sections 668.3(5) (requiring the court to instruct the jury as to the effects of its findings in a comparative fault action) and 709.6 ("No instruction shall be given in a trial for sexual abuse cautioning the jury to use a different standard relating to a victim's testimony than that of any other witness to that offense or any other offense.").

> paradigm shift that is caused by overruling established common-law principles must be tempered by judicial restraint, with deference to the doctrine of *stare decisis* and its role in perpetuating stability under the rule of law.

*Aizupitis v. State*, 699 A.2d 1092, 1094 (Del. 1997) (citations omitted). As Becker's arguments are not sufficiently persuasive to justify overruling our prior cases, we will adhere to our well-established precedents which, as a general rule, do not require the district court to give an instruction to the jury on the consequences of a verdict of not guilty by reason of insanity. *See Hamann*, 285 N.W.2d at 185–86. Due process does not require a district court to give a consequence instruction simply because the defendant requests it.

**B. The Request for the Instruction Based on the Totality of the Circumstances at Becker's Trial.** Some of Becker's due process arguments emphasize the specific facts of his case. Therefore, we will also examine whether, based on the specific facts and circumstances of Becker's case, a consequence instruction was required by due process.

In the past, we have employed a totality-of-the-circumstances test to evaluate due process claims, even though we have not labeled the test as such. In *State v. McMullin*, 421 N.W.2d 517 (Iowa 1988), we addressed a defendant's claim that placing "the portion of the insanity instruction that told the jury to consider the insanity defense before it considered defendant's guilt or innocence of the crimes charged" violated procedural due process. 421 N.W.2d at 518. We agreed with the defendant that the jury instruction was faulty and

> present[ed] a risk that a jury, upon finding that a defendant is insane, may return a verdict of not guilty by reason of insanity without giving proper consideration to whether the defendant is entitled to a verdict of not guilty by reason of the State's failure to prove its case.

*Id.* at 518–19. We then turned to the question of whether the faulty instruction denied the defendant due process of law under the Fourteenth Amendment of the Federal Constitution. *Id.* at 519.

While due process allows "a state's legislative body to define criminal conduct and to create procedures by which the criminal laws will be enforced in the courts," it would not allow a state to shift the burden of disproving an element of the crime charged to the defendant. *Id.* The true object of the due process inquiry in that case was "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 520 (citation and internal quotation marks omitted). We noted that "the instructions repeatedly set out that the State must prove each element by evidence beyond a reasonable doubt." *Id.* We concluded that placing the insanity instruction before the instructions regarding guilt and innocence, though erroneous, did not shift the burden of proof to the defendant and therefore did not violate due process. *Id.* Thus our determination of whether a due process violation occurred was based on all of the instructions given at trial, as opposed to whether a single faulty instruction was given.

In considering due process challenges to jury instructions in individual cases, the Supreme Court has also employed a totality-of-the-circumstances test. For instance, in *Kentucky v. Whorton,* 441 U.S. 786, 99 S. Ct. 2088, 60 L. Ed. 2d 640 (1979), the Supreme Court used a totality-of-the-circumstances analysis—considering "all instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors"—to determine whether the defendant received a constitutionally fair trial when the court refused to give a requested jury instruction on the presumption of innocence in a

criminal proceeding. 441 U.S. at 789, 99 S. Ct. at 2090, 60 L. Ed. 2d at 643. The approach to evaluating jury instructions under due process was summarized in *Delo v. Lashley*, 507 U.S. 272, 113 S. Ct. 1222, 122 L. Ed. 2d 620 (1993), where the Supreme Court rejected a due process challenge based upon the failure of the trial court to give a requested instruction concerning the petitioner's alleged lack of significant history of prior criminal activity in the punishment phase of a capital case. The Supreme Court stated:

> An instruction is constitutionally required only when, in light of the totality of the circumstances, there is a genuine danger that the jury will convict based on something other than the State's lawful evidence, proved beyond a reasonable doubt.

*Delo*, 507 U.S. at 278, 113 S. Ct. at 1226, 122 L. Ed. 2d at 628 (citation and internal quotation marks omitted).

Most importantly, the totality-of-the-circumstances test was applied in a jury instruction case in *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994). In this case, the Supreme Court considered whether the failure to give a jury instruction that the defendant was ineligible for parole violated due process where the state raised the specter of the defendant's future dangerousness in the penalty phase of a capital trial. *Simmons*, 512 U.S. at 156, 165, 114 S. Ct. at 2190, 2194, 129 L. Ed. 2d at 138, 143. A divided Supreme Court concluded under the circumstances that due process required that the instruction be given. *Id.* at 171–75, 114 S. Ct. at 2198–2200, 129 L. Ed. 2d at 147–51. We will now consider whether in this particular case, based on the unique factual circumstances, due process required that Becker's proposed instruction be given.

Applying the totality-of-the-circumstances test, we conclude that Becker has not made out a due process violation. We cannot conclude that Becker did not receive a fundamentally fair trial under all the facts and circumstances. The jury asked the court what the consequences of a not-guilty-by-reason-of-insanity verdict might be, but there is no direct evidence that the jurors convicted based on their beliefs regarding the consequences of an insanity verdict. We might come to a different conclusion if prosecutors had given the inaccurate impression that Becker would go free if he was found guilty by reason of insanity. *See id.* at 165, 114 S. Ct. at 2194, 129 L. Ed. 2d at 143 (noting that due process required an instruction on parole ineligibility was required when the prosecutor "raised the specter of petitioner's future dangerousness generally, but then thwarted all efforts by petitioner to demonstrate that, contrary to the prosecutor's intimations, he never would be released on parole"). However, there is no allegation that the State made any improper remarks regarding the consequences of a not-guilty-by-reason-of-insanity verdict in this case.

We are also concerned about the content of Becker's proposed consequence instruction. Becker's proposed instruction would have informed the jury that if he were found not guilty by reason of insanity, he would be "ordered committed to a state mental health institute or other appropriate facility for a complete psychiatric evaluation." Becker claims that such an "instruction may effectively eliminate unnecessary and dangerous speculation [by the jury]" and inform the jury "what would happen if they voted not guilty by reason of insanity." The State claims that Becker's instruction was unnecessary because jurors are presumed to follow jury instructions. Further, even if jurors had the concerns pointed out by Becker, Becker's proposed instruction was

"inadequate to achieve its aims" of alleviating the jury's concerns about the consequences of a not-guilty-by-reason-of-insanity verdict.

We agree with the State on both counts. First, juries are presumed to follow the court's instructions. *Hanes*, 790 N.W.2d at 552. The court instructed the jurors not to concern themselves with the consequences of a not-guilty-by-reason-of-insanity verdict. We must presume the jurors followed that instruction and did not consider the consequences when engaging in their deliberations.

Second, even if the jurors were willing to disregard their oath and the district court's instruction, Becker's proposed instruction would not adequately and accurately advise the jury of the possible consequences of the not-guilty-by-reason-of-insanity verdict. It only tells the jury that Becker will be evaluated. It provides no guarantees to the jury as to when and under what circumstances Becker might be released. As the Supreme Court noted,

> [I]f the members of a jury are so fearful of a particular defendant's release that they would violate their oaths by convicting [the defendant] solely in order to ensure that he is not set free, it is questionable whether they would be reassured by anything short of an instruction strongly suggesting that the defendant, if found NGI, would very likely be civilly committed for a lengthy period.

*Shannon,* 512 U.S. at 585–86, 114 S. Ct. at 2427, 129 L. Ed. 2d at 470 (citations and internal quotation marks omitted). Becker's instruction would have provided the jury with a fraction of the postverdict commitment and evaluation procedures required by Iowa Rule of Criminal Procedure 2.22(8). Under rule 2.22(8), it is impossible to know when a defendant found not guilty by reason of insanity might be released. *See* Iowa R. Crim. P. 2.22(8). Since Becker's release would be contingent on a number of future events, Becker's proposed instruction

does not fully and accurately explain the consequences of a not-guilty-by-reason-of-insanity verdict. *See People v. Goad*, 364 N.W.2d 584, 591 (Mich. 1984). Accordingly, the district court did not err by refusing to provide the proposed consequence instruction, and no due process right was violated.

**C. Conclusion.** To summarize, we conclude that Becker has not made the case for a due process violation under article I, section 9 of the Iowa Constitution under either the *Medina* categorical framework or the individual totality of the circumstances test. Under the *Medina* test, we hold that fundamental fairness does not mandate that a district court give the instruction whenever a defendant requests it. Under the totality-of-the-circumstances test, it is possible that due process may require a consequence instruction "under certain limited circumstances." *Shannon*, 512 U.S. at 587, 114 S. Ct. at 2428, 129 L. Ed. 2d at 471. However, we conclude that under the specific facts and circumstances of this case, fundamental fairness did not require the district court to instruct the jury that, if the defendant were found not guilty by reason of insanity, he would be committed to a mental health facility for evaluation. It is unnecessary to provide a list of the possible circumstances that might mandate a consequence instruction. Instead, like the Supreme Court, "[w]e note this possibility merely so that our decision will not be misunderstood as an absolute prohibition on instructing the jury with regard to the consequences of [a not-guilty-by-reason-of-insanity] verdict." *Id.* at 587–88, 114 S. Ct. at 2428, 129 L. Ed. 2d at 471. After our de novo review of the record in this case, we hold that due process under article I, section 9 of the Iowa Constitution did not require the court to inform the jury of the consequences of a not-

guilty-by-reason-of-insanity verdict. The district court did not err by refusing to provide the jury with the proposed consequence instruction.

## VI. Disposition.

The instructions given by the district court, when read as a whole, fairly and accurately advised the jury of the legal standard it was to apply to Becker's insanity defense. Becker's appeal on this ground is without merit. Also, due process under article I, section 9 of the Iowa Constitution does not require the district court inform the jury of the consequences of a not-guilty-by-reason-of-insanity verdict under the facts of this case. Becker's conviction is affirmed.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Hecht, J., who dissents.

**HECHT, Justice (dissenting).**

I respectfully dissent. Similar to the Fifth Amendment of the United States Constitution, article I, section 9 of the Iowa Constitution guarantees Becker's fundamental right to a fair jury trial and precludes a deprivation of his liberty interest without due process of law. "The right to present a defense is . . . fundamental and essential to a fair trial . . . ." *State v. Fox*, 491 N.W.2d 527, 531 (Iowa 1992).

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."

*Id.* (quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923, 18 L. Ed. 2d 1019, 1023 (1967)). We, and other courts, have concluded a defendant's right to present a defense has been denied when defense witnesses have been prevented by court rule from testifying or intimidated into not testifying, *Webb v. Texas*, 409 U.S. 95, 98, 93 S. Ct. 351, 353–54, 34 L. Ed. 2d 330, 333 (1972) (per curiam); *Washington*, 388 U.S. at 23, 87 S. Ct. at 1925, 18 L. Ed. 2d at 1025, when a district court fails to instruct the jury on a defense theory of the case, *Bradley v. Duncan*, 315 F.3d 1091, 1098–99 (9th Cir. 2002), when the district court excludes testimony relevant to a defendant's defense of justification, *State v. Begey*, 672 N.W.2d 747, 753 (Iowa 2003), or when an indigent defendant is denied court funds to hire an expert to prepare a defense, *State v. Coker*, 412 N.W.2d 589, 592–93 (Iowa 1987). Applying the same reasoning, I would hold that the district court's failure to give a

"consequences" instruction under the circumstances of this case deprived Becker of due process because it, in effect, nullified his insanity defense and thus deprived him of a fair trial.

The majority opinion details the long history of the insanity defense in Iowa jurisprudence. Expressing the public policy that insane persons shall not be convicted of a crime, the legislature codified the defense based on the enlightened proposition that mental illness should be treated, not punished. The trial in this case was about only one substantial question: Would the jury credit Becker's insanity defense?

The standard against which the insanity defense is measured is, of course, a demanding one. Public policy necessitates that the defense be available only when the defendant's severe mental illness caused the act(s) constituting the factual basis of a criminal charge. Jurors take this notion seriously, tending not to lightly excuse violent and homicidal behavior from criminal sanction on insanity grounds. The extraordinary factual circumstances of this case made it obvious before Becker's trial began that jurors would have overwhelming concerns about the consequences of an insanity verdict as they pondered whether Becker proved the defense.

As the majority opinion recounts, Becker had repeatedly exhibited conduct suggesting severe mental derangement during the nine months prior to the shooting. On three occasions, Becker was hospitalized for mental health treatment after episodes of violent behavior against both family members and a stranger. The episodes of violence were accompanied by statements revealing Becker had an attenuated connection with reality, including persistent delusional claims that Coach Ed Thomas controlled him and others through extrasensory powers. Despite his recurring inpatient psychiatric treatment, Becker's

severe mental illness was not controlled. Less than a week before he shot and killed Coach Thomas, Becker violently assaulted a stranger, damaged the stranger's home by striking it with a baseball bat and crashing into it with a car, and was admitted to a hospital for treatment. Becker was discharged from the hospital approximately twenty-four hours before the tragedy that led to this prosecution. Thus, the factual circumstances of Becker's mental illness forming the foundation of his insanity defense were characterized by recurring episodes of extreme violence interrupted by short courses of unsuccessful treatment of schizophrenia.

Becker's defense counsel astutely anticipated these extraordinary circumstances would make it impossible for the jury in this case to credit the insanity defense without a consequences instruction. Counsel correctly intuited that if kept in the dark about the consequences of a verdict of insanity, the jury could not take a chance that Becker would again be turned loose without adequate medical management of his severe mental illness to continue his crazed and extremely violent behavior that had already caused one death. In my view, the peculiar circumstances of this case demanded a consequences instruction to allow Becker a meaningful opportunity to assert a statutory insanity defense and to assure him a fair trial.

The record amply demonstrates the jury had reached an impasse on the insanity defense by midday on the third day of its deliberations. Seeking to break the impasse, the jury requested information about "what would happen to Mark Becker" if he were found insane. I believe this request clearly reveals some jurors were unwilling to credit the insanity defense without the additional information. Indeed, when the district court denied the jurors' request for such information, the

deadlock persisted through the remainder of the third day of deliberations, and through the fourth day as well, before the impasse was broken and the uninformed jury rejected Becker's defense. Under these circumstances, I would hold, just as surely as if Becker had been denied the opportunity to present testimony, expert or otherwise, supporting his insanity defense, the district court's rejection of Becker's proposed "consequences" instruction deprived Becker of a meaningful opportunity to assert his insanity defense. Given Becker's history of violent, delusional, and homicidal conduct consistent with severe mental derangement, the jurors were justifiably unwilling, without the requested information about the consequences, to risk the possibility that Becker would again be released without proper psychiatric assessment and management. Deprived of a meaningful opportunity to assert his only defense, Becker's right to a fair jury trial was abridged. I would grant him a new trial.